

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-12-1995

# Siegel v Carrier Express

Precedential or Non-Precedential:

Docket 94-1885

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Siegel v Carrier Express" (1995). *1995 Decisions.* Paper 131.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/131

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————————

No. 94-1885

—————————

SIEGEL TRANSFER, INC.; ROBIN EXPRESS
TRANSFER, INC.; JORUSS TRUCKING, INC.,

Appellants

vs.

CARRIER EXPRESS, INC.; BETHRAN, INC.;
BETHLEHEM STEEL CORPORATION

—————————

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 92-cv-07370)

—————————

Argued
March 27, 1995
Before:  MANSMANN, COWEN and LEWIS, Circuit Judges.

(Filed  May 12, 1995)

—————————

David H. Moskowitz, Esquire (ARGUED)
David H. Moskowitz & Associates
1890 Rose Cottage Lane
Malvern, PA  19355

COUNSEL FOR APPELLANTS

Nancy J. Gellman, Esquire (ARGUED)
Debra C. Swartz, Esquire
Conrad, O'Brien, Gellman & Rohn
1515 Market Street
16th Floor
Philadelphia, PA  19102

COUNSEL FOR APPELLEES

—————————

OPINION OF THE COURT

—————————

MANSMANN, Circuit Judge.

This case arises out of the termination of a motor carrier contract. The plaintiffs, Siegel Transfer, Inc., Robin Express Transfer, Inc., and Joruss Trucking, Inc., alleged that the contract's termination and subsequent refusals to deal on the part of the defendants, Bethlehem Steel Corporation and its subsidiaries, Bethran, Inc. and Carrier Express, Inc., violated section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The plaintiffs also charged the defendants with violations of the Interstate Commerce Act, 49 U.S.C. § 10101 et seq., and the Elkins Act, 49 U.S.C. §§ 11901-11903, 11915-11916, and with several state law causes of action. The plaintiffs now appeal the district court's decision to grant the defendants' motion for summary judgment and motion to dismiss. The issues we address are whether the companies in the Bethlehem Steel corporate family and their agents were legally capable of engaging in an antitrust conspiracy with each other, whether the plaintiffs had a private right of action under the federal transportation statutes, and whether the defendants breached the parties' agreement.

In the wake of the Supreme Court's decision in Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984), we hold that the defendants were legally incapable of conspiring with one another or with their agents. We also find that neither the Interstate Commerce Act nor the Elkins Act authorizes the plaintiffs to file a private cause of action in a federal court. Finally, we conclude that the defendants are not liable for

breach of contract.  Thus, we will affirm the judgment of the district court.

I.

We begin our analysis by reviewing the evidence presented in this case.  In considering a motion for summary judgment, a court does not resolve factual disputes or make credibility determinations, and must view facts and inferences in the light most favorable to the party opposing the motion.  <u>Big Apple BMW, Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992), <u>cert. denied</u>, ___ U.S. ___, 113 S. Ct. 1262 (1993).

Siegel Transfer, Robin Express, and Joruss Trucking were owned by Russell Siegel and his wife, and were based in Sparrows Point, Maryland.  Siegel Transfer, a motor contract carrier,[1] hauled steel, lumber, telephone poles and heavy

---

[1].    Under the Interstate Commerce Act, motor carriers fall into two defined categories:  motor common carriers and motor contract carriers:

**§ 10102.  Definitions**

In this subtitle --

   (14) "motor common carrier" means a person holding itself out to the general public to provide motor vehicle transportation for compensation over regular or irregular routes, or both.

   (15) "motor contract carrier" means --

      (A) a person, other than a motor common carrier, providing motor vehicle transportation of passengers for

equipment for various shippers; Robin Express leased trucks, trailers and drivers to Siegel Transfer and other carriers; and Joruss Trucking also leased trucks to Siegel Transfer.

In 1985, Bethlehem Steel made plans to acquire two motor carriers, Bethran and Carrier Express, through its subsidiary, the Philadelphia Bethlehem and New England Railroad. While Bethlehem Steel did not anticipate that it would satisfy all of its transportation needs by acquiring these carriers, it hoped to capture at least a portion of the revenue it was paying to outside truckers.

(..continued)
> compensation under continuing agreements with a person or a limited number of persons---
>
>> (i) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or
>>
>> (ii) designed to meet the distinct needs of each such person; and
>
> (B) a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more persons--
>
>> (i) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or
>>
>> (ii) designed to meet the distinct needs of each such person.

49 U.S.C. § 10102(14),(15).

Because section 11341 of the Interstate Commerce Act gives the Interstate Commerce Commission exclusive authority to oversee acquisitions of this type, Bethlehem and the Railroad filed a petition, requesting permission to acquire control[2] of Bethran and Carrier Express, without having to engage in the Commission's prior approval process. Section 11343(e) authorizes the Commission to exempt an acquisition from regulatory oversight if it finds that regulation is not necessary to carry out the transportation policy of the Act,[3] and the acquisition is limited in scope or unlikely to result in an abuse of market power. 49 U.S.C. § 11343(e). Finding that the proposed acquisition met these criteria, the Commission exempted it from the Act's prior approval requirements. Under section 13341, the Commission's exemption not only authorized the parties to proceed with the acquisition, but immunized it from the antitrust laws as well. 49 U.S.C. § 13341. Once the acquisition was finalized, Bethlehem Steel owned 99.92% (8,993 of 9,000 shares) of the Railroad's

---

[2]. The Act defines "control" in pertinent part as "actual control, legal control, and the power to exercise control, through or by (A) common directors, officers, stockholders, a voting trust, or a holding or investment company, or (B) any other means." 49 U.S.C. § 10102(7).

[3]. The Act aims to recognize and preserve the inherent advantages of various modes of transportation; promote safe, economical and efficient transportation; encourage sound economic conditions among carriers; encourage the establishment and maintenance of reasonable rates without unreasonable discrimination or unfair or destructive competitive practices; coordinate federal and state efforts on transportation matters; and encourage fair wages and working conditions in the transportation industry. 49 U.S.C. § 10101.

stock;[4] the Railroad owned 100% of Bethran's stock; and Bethran owned 100% of Carrier Express' stock.

Carrier Express, already a licensed common and contract carrier, obtained broker authority from the Commission. Organized to operate without exit barriers, Carrier Express did not hire employees, acquire equipment or engage its own drivers. Instead, it used commissioned, non-exclusive agents in different parts of the country to make arrangements with owner-operators or with other carriers who had access to trucks and drivers to carry the freight it was under contract to transport. The agents made hauling arrangements with whomever Carrier Express authorized to transport its freight.

Carrier Express operations were managed by Oak Management, Inc. Under the parties' contract, Oak Management oversaw all of Carrier Express' day-to-day functions and received a percentage of Carrier Express' revenues as payment for its services. Thomas Rediehs, a Vice President of Carrier Express, was the owner and President of Oak Management, and Kermit Bryan was Oak Management's Executive Vice President.

Oak Management also managed the operations of Rediehs Express, a motor common carrier, motor contract carrier and broker. Rediehs' wife and children owned Rediehs Express, and Bryan was its Operations Manager. Rediehs Express hauled

---

[4]. The seven shares of stock that Bethlehem Steel did not own were issued in the name of the Railroad's current officers, and could not be sold or transferred. Whenever the Railroad replaced an officer, the stock was reissued in the new officer's name.

Bethlehem Steel products from Bethlehem Steel's plant located in Burns Harbor, Indiana, and did some business with Carrier Express.

Under its motor contract carrier operating authority, Carrier Express entered into a contract dated January 15, 1986 with Bethlehem Steel, agreeing to transport Bethlehem Steel goods at given rates. In July, 1988, a contract between Bethlehem Steel and Bethran was assigned to Carrier Express,[5] which obligated Carrier Express to refund to Bethlehem Steel a sum equal to 5% of the total revenue it received for transporting Bethlehem Steel freight.

In late 1985, Siegel Transfer, Carrier Express and "Bethran doing business as Carrier [Express]" executed a "Contract for Transportation of Property Between A Motor Carrier Broker [Carrier Express] and a Motor Contract Carrier [Siegel Transfer] In Accordance With the Provisions of 49 C.F.R. 1053." The contract took effect on January 4, 1986, and after an initial term of three years, remained in effect from year to year, subject to the right of either party to terminate upon thirty days' written notice. Under the contract, Carrier Express was obligated to offer Siegel Transfer a minimum of 30,000 pounds of authorized commodities per year for transport and to pay Siegel Transfer 90% of the freight rate received by Carrier Express from the shipper. Russell Siegel was named a Carrier Express agent for the Baltimore area and agreed to receive a 6% commission from

---

[5]. In July, 1988, Bethran ceased motor carrier operations.

Carrier Express on the loads he arranged for shipment by companies other than Siegel Transfer.

While the contract was in effect, Siegel Transfer transported Bethlehem Steel goods received from Carrier Express almost exclusively out of Bethlehem Steel's Sparrows Point plant. As to the Bethlehem Steel freight offered by Carrier Express to Siegel Transfer for transport, the 5% refund that Carrier Express owed to Bethlehem Steel was paid from the 10% of the freight rate Carrier Express retained, not from the 90% of the freight rate that Siegel Transfer was paid.

In 1988, while carrying freight received from Carrier Express, a Siegel Transfer vehicle was involved in a serious accident in Alabama. Joined in the lawsuit which followed, Carrier Express paid a substantial sum of money to settle the claims brought against it. That same year, another Siegel Transfer vehicle was involved in another serious accident in Georgia. In December of 1989, Carrier Express was temporarily suspended from transporting goods for Bethlehem Steel because Siegel Transfer had violated Bethlehem Steel's loading and weight limit rules.

James C. Matthews, Vice-President of Carrier Express and Bethran, was aware of and concerned about these incidents. In 1989, Matthews decided to terminate Carrier Express' contract with Siegel Transfer. This decision was based, according to Matthews, on his unwillingness to expose Carrier Express to the continued risks of doing business with Siegel Transfer. Matthews

spoke of his intention to terminate the contract with Carl Eckenrode, the President of Bethran, Carrier Express and the Railroad, and a Bethran director; Steven Mollman, Bethran's operations manager and one of its directors; and William Van Heel, a district transportation manager of Bethlehem Steel and a Bethran director. Additionally, Matthews informed Rediehs and Bryan of his decision. Believing that Carrier Express would not be able to find owner-operators or carriers to perform the hauling that Siegel Transfer was handling and would, therefore, suffer a loss of revenue and profit, Rediehs argued against the termination.

Matthews, Rediehs, Bryan and Van Heel convened on January 4, 1990 at Bethlehem Steel's Sparrows Point plant to inform Siegel that Carrier Express' contract with Siegel Transfer was terminated. Prior to their speaking personally with Siegel, Rediehs again voiced his opposition to the termination. Matthews, however, refused to alter his decision. Consequently, when Siegel arrived at the meeting, he was told of the termination, and later that day, received written notice from Matthews.

During the thirty-day notice period which followed, Carrier Express offered Siegel Transfer over 600,000 pounds of freight to transport. At Carrier Express' direction, Oak Management commenced instructing Carrier Express agents that the contract with Siegel Transfer had been terminated and that Siegel Transfer was no longer authorized to carry Carrier Express freight. As an accommodation to Carrier Express, Oak Management

assumed responsibility for the Baltimore Carrier Express agency at a 4% commission rate, but only reluctantly, expecting that the agency would be unprofitable.  Just as Rediehs had anticipated, Carrier Express was unable to find trucks to replace those that Siegel Transfer had made available; the amount of freight that Carrier Express transported out of Sparrow Point decreased and its revenues declined.  Oak Management, in turn, suffered a financial loss.  Moreover, Oak Management lost money as Carrier Express' Baltimore agent and relinquished the position in 1991.

Shortly after the contract's termination, Robin Express leased all of its trucks and drivers to Ligon Nationwide, a trucking company of substantial size.  Under the arrangement with Ligon Nationwide, which lasted for approximately one year, Robin Express trucks were used to transport freight for several shippers, including Bethlehem Steel.  During this time, one of the Bethlehem Steel district transportation superintendents, for whom Siegel Transfer's safety record was unacceptable, advised an agent for Glass Container, a motor carrier, not to use Siegel equipment to haul products from the Bethlehem Steel rod mill located in Sparrows Point.

In February, 1990, Siegel Transfer relinquished its contract carrier operating authority and ceased doing business; Joruss Trucking suspended operations in July, 1990.  In November 1990, Robin Express entered into lease agreements with other truckers, who used Robin Express trucks and drivers to carry loads for Bethlehem Steel and a number of other shippers.  Unable

to secure a sufficient amount of business, however, Robin Express ceased to operate in 1991.

On December 23, 1992, Siegel Transfer, Robin Express and Joruss Trucking commenced this action against Carrier Express, Bethran and Bethlehem Steel. On February 15, 1994, the plaintiffs filed an Amended Complaint, asserting two federal causes of action, one under section 1 of the Sherman Act, 15 U.S.C. § 1 (Count I), and the other under the Interstate Commerce Act, 49 U.S.C. § 10101 et seq., and the Elkins Act, 49 U.S.C. §§ 11901-11903, 11915-11916 (Count XI), as well as several state law claims: violations of the Maryland Antitrust Act (Count II), breach of contract (Counts III and IV), breach of the implied covenant of good faith (Counts VII and VIII), promissory estoppel (Count VI) and civil conspiracy (Count XI).

On March 21, 1994, the defendants filed a motion to dismiss the plaintiffs' Interstate Commerce Act and Elkins Act claims or, in the alternative, to refer them to the Interstate Commerce Commission, and a motion for summary judgment on the plaintiffs' other claims. On July 1, 1994, the district court dismissed the federal transportation law claims, concluding that neither the Interstate Commerce Act nor the Elkins Act gave the plaintiffs a private right of action. Siegel Transfer, Inc. v. Carrier Express, Inc., 856 F. Supp. 990, 1002-05 (E.D. Pa. 1994). The court also granted summary judgment in the defendants' favor on the plaintiffs' remaining claims, with the exception of Count

VI for promissory estoppel.[6]  On the antitrust and civil conspiracy claims, the court concluded that the plaintiffs failed to show that "two or more economic actors" conspired against them, applying the Supreme Court's decision in Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984).  856 F. Supp. at 995-1002, 1005, 1009.  As to the contract and implied duty of good faith claims, the court rejected the plaintiffs' theory of breach, finding it contrary to the clear and unambiguous language of the parties' agreement.  Id. at 1005-06, 1008-09.

On August 22, 1994, judgment was entered for the defendants, and on September 8, 1994, the plaintiffs filed an appeal.  We will first address the federal antitrust issues this appeal raises, the federal transportation law issues second, and the state law questions third.

II.

Summary judgment may present the district court with an opportunity to dispose of meritless cases and avoid wasteful trials.  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1985).  This is true even in antitrust cases "where motive and intent play leading roles, proof is largely in the hands of alleged conspirators, and hostile witnesses thicken the plot."  Big Apple

---

[6].      Finding genuine issues of disputed fact, the district court denied the defendants' motion for summary judgment as to the promissory estoppel claim.  Siegel Transfer, Inc. v. Carrier Express, Inc., 856 F. Supp. 990, 1007-08 (E.D. Pa. 1994).  On August 22, 1994, a stipulation and order dismissing this claim without prejudice was entered.

BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, ___ U.S. ___, 113 S. Ct. 1262 (1993), quoting Pollar v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473 (1962).

Summary judgment must be granted where no genuine issue of material fact exists for resolution at trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On summary judgment, the moving party need not disprove the opposing party's claim, but does have the burden to show the absence of any genuine issues of material fact. Celotex, 477 U.S. at 323. If the movant meets this burden, then the opponent may not rest on allegations in pleadings, but must counter with specific facts which demonstrate that there exists a genuine issue for trial. Id. As in this case, when the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the nonmoving party has not offered evidence sufficient to establish the existence of an element essential to its case. Id. at 322. We remain mindful that in ruling on a motion for summary judgment, a court must assess the material facts against the proof required of the plaintiff on substantive issues.

III.

Section 1 of the Sherman Act provides in pertinent part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. For a section 1

claim under the Sherman Act, "a plaintiff must prove `concerted action,' a collective reference to the `contract . . . combination or conspiracy.'" Big Apple, 974 F.2d 1364, quoting Bogosian v. Gulf Oil Corp., 561 F.2d 434, 445 (3d Cir. 1977), cert. denied, 434 U.S. 1086 (1978). "Unilateral action, no matter what its motivation, cannot violate [section] 1." Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 110 (3d Cir. 1980), cert. denied, 451 U.S. 911 (1981). A "`unity of purpose or a common design and understanding or a meeting of the minds in an unlawful arrangement' must exist to trigger section 1 liability." Copperweld, 467 U.S. at 771, quoting American Tobacco Co. v. United States, 328 U.S. 781, 810 (1946). Proof of concerted action requires evidence that two or more distinct entities agreed to take action against a plaintiff. Weiss v. York Hospital, 745 F.2d 786, 813 (3d Cir. 1984), cert. denied, 470 U.S. 1060 (1985).

Here the plaintiffs assert that Bethlehem Steel, Bethran and Carrier Express, with several unnamed co-conspirators, combined to eliminate the plaintiffs and stifle competition among motor contract carriers transporting steel products in the traffic lanes out of and back to Bethlehem Steel's Sparrow Point plant. While it is difficult to derive from the plaintiffs' pleadings and proof who participated in a conspiracy to achieve this goal, we understand them to contend that the companies in the Bethlehem Steel corporate family joined with Oak Management to terminate the Carrier Express contract with Siegel Transfer, and thereafter, enlisted assistance from

Oak Management, Thomas Rediehs, Kermit Bryan, Carrier Express field agents, other motor carrier agents, and Rediehs Express to deny them the opportunity to haul products for Bethlehem Steel. The plaintiffs' evidence of concerted action with regard to contract termination is the meeting the representatives of Bethlehem Steel, Bethran, Carrier Express and Oak Management held on January 4, 1990 to inform Russell Siegel that Siegel Transfer's contract with Carrier Express would not be renewed; their evidence of a concerted refusal to deal are the post-termination contacts Oak Management had with Carrier Express agents to advise them that Siegel Transfer was no longer authorized to haul Carrier Express freight, and the directive from a Bethlehem Steel district transportation superintendent to a Glass Container agent not to use Siegel equipment to transport Bethlehem Steel goods. The plaintiffs also contend that the 5% refund Carrier Express paid to Bethlehem Steel is a per se violation of the Sherman Act.

Before we evaluate the plaintiffs' evidence, we will address the threshold issue of conspiratorial capacity in order to determine who among the defendants and their alleged co-conspirators, if anyone, could participate in an antitrust conspiracy.

Until the Supreme Court's decision in Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984), related corporations were generally perceived as separate entities capable of concerted activity, a view which came to be known as the "intra-enterprise conspiracy" doctrine. Id. at 759. In

Copperweld, however, the Supreme Court considered whether a parent company and its wholly owned subsidiary are legally capable of conspiring with one another under section 1 of the Sherman Act, and determined that they are not.  Id. at 759-77. The fundamental question the Court confronted was whether an agreement between a parent and its wholly owned subsidiary represents the conduct of one economic actor or two.

In its opinion, the Court acknowledged that the Sherman Act contains a basic distinction between concerted and independent action, and discussed the reason why Congress chose to treat concerted behavior more strictly:

> Concerted activity inherently is fraught with anticompetitive risk.  It deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands.  In any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit.  This not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction.

Id. at 768-69.

The Court then noted that although "[n]othing in the literal meaning of [the] terms [of section 1] excludes coordinated conduct among officers or employees of the same company", it is obvious that an "internal `agreement' to implement a single firm's policies does not raise the antitrust dangers that [section] 1 was designed to police."  Id. at 769 (emphasis in original).

Recognizing that section 1 is not violated by the internally coordinated conduct of a corporation and one of its unincorporated divisions because such conduct is essentially undertaken by one economic actor pursuing a single firm's interests and goals, the Court stated:

> Although this Court has not previously
> addressed the question, there can be little
> doubt that the operations of a corporate
> enterprise organized into divisions must be
> judged as the conduct of a single actor.
> . . . A division within a corporate
> structure pursues the common interests of the
> whole rather than interests separate from
> those of the corporation itself . . . .
> Because coordination between a corporation
> and its division does not represent a sudden
> joining of two independent sources of
> economic power previously pursuing separate
> interests, it is not an activity that
> warrants § 1 scrutiny.

Id. at 770-71 (footnote omitted).

Similarly, the Court concluded that given the control a parent wields over its wholly owned subsidiary, these parties always share a "unity of purpose or a common design", and thus, cannot engage in section 1 concerted activity:

> A parent and its wholly owned subsidiary have
> a complete unity of interest. Their
> objectives are common, not disparate; their
> general corporate actions are guided or
> determined not by two separate corporate
> consciousnesses, but one. . . . If a parent
> and a wholly owned subsidiary do "agree" to a
> course of action, there is no sudden joining
> of economic resources that had previously
> served different interests, and there is no
> justification for § 1 scrutiny. . . .
>
> [I]n reality a parent and a wholly owned
> subsidiary always have a "unity of purpose or
> a common design." They share a common

> purpose whether or not the parent keeps a
> tight rein over the subsidiary; the parent
> may assert full control at any moment if the
> subsidiary fails to act in the parent's best
> interests.

Id. at 771-72 (footnote omitted)(emphasis in original).

Although the Court limited its holding to the case of a
parent and wholly owned subsidiary, it nonetheless encouraged the
courts to analyze the substance, not the form, of economic
arrangements when faced with allegations of intra-corporate
conspiracies:

> The intra-enterprise conspiracy doctrine
> looks to the form of an enterprise's
> structure and ignores the reality. Antitrust
> liability should not depend on whether a
> corporate subunit is organized as an
> unincorporated division or a wholly owned
> subsidiary. A corporation has complete power
> to maintain a wholly owned subsidiary in
> either form. The economic, legal, or other
> considerations that lead corporate management
> to choose one structure over the other are
> not relevant to whether the enterprise's
> conduct seriously threatens competition.

Id. at 772-73 (footnote omitted).

IV.

A.

We turn now to examine the evidence proffered by the
plaintiffs in response to the defendants' motion for summary
judgment and their supporting evidence.

1.      The Alleged Conspiracy Among the Bethlehem Steel
        Companies

It is undisputed that, with the exception of the Railroad, the Bethlehem Steel companies were wholly owned by the parent company.  Although Bethlehem Steel did not own .08% of the Railroad's stock, the difference between its 99.92% ownership and the 100% ownership in Copperweld is de minimus.  See Satellite Financial Planning Corp. v. First Nat'l. Bank, 633 F. Supp. 386, 395 (D. Del.), aff'd on reconsideration, 643 F. Supp. 449 (1986) (the de minimus difference between 99% plus ownership and 100% ownership does not diminish Copperweld's applicability).[7]  The plaintiffs have not shown why an absolute rule of 100% ownership must be applied in this case.[8]

Moreover, it is also beyond dispute that Bethlehem Steel, with 8,993 of the Railroad's 9,000 outstanding shares of

---

[7].     The courts have not only applied Copperweld in cases involving de minimus deviations from 100% ownership, but have also extended its principles to situations where parental ownership was in the 80% to 91.9% range.  Stephen Calkins, Copperweld in the Courts:  The Road to Caribe, 63 Antitrust L.J. 345, 351-41 (1995) (reviewing and commenting on the several categories of judicial treatment of Copperweld).

[8].     The plaintiffs argue that the mere fact that Bethlehem Steel did not wholly own the Railroad requires that we reject Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984), and instead, seek guidance from the Supreme Court's decision in United States v. Yellow Cab Co., 332 U.S. 218 (1947).  In Copperweld, the Supreme Court suggested that Yellow Cab may stand "for a narrow rule based on the original illegality of the affiliation" between a parent and its subsidiary.  467 U.S. at 762 n. 6.  Even this "narrow rule" does not apply:  the plaintiffs did not challenge Bethlehem Steel's original acquisition of Bethran and Carrier Express on antitrust grounds; nor do they challenge it here.  We note, also, that the Interstate Commerce Commission's order exempting the original acquisition from regulation immunized it from the antitrust laws.  See supra, page 5.

stock, had complete control over the Railroad,[9] as well as over Bethran and Carrier Express. Hence, these companies were, in substance, one economic unit, incapable of an antitrust conspiracy under Copperweld. See Advanced Health-Care Services, Inc. v. Radford Community Hosp., 910 F.2d 139, 146 (4th Cir. 1990) (under Copperweld, two subsidiaries wholly owned by the same parent are legally incapable of conspiring with one another for purposes of section 1); Century Oil Tool, Inc. v. Production Specialties Inc., 737 F.2d 1316 (5th Cir. 1984) (under Copperweld, separate corporations commonly owned by three men, two of whom owned 30% of each corporation and one of whom owned the remaining 40% of each corporation, were incapable of an antitrust conspiracy).

The plaintiffs contend, without citation to authority, that the Interstate Commerce Act does not legally permit a parent company shipper to control the affairs of a motor carrier subsidiary and requires that a parent shipper and its carrier subsidiary conduct their affairs independently of each other. The Act, however, neither prohibits such control nor requires such independence. To the contrary, the Act specifically permits a shipper to acquire control of a motor carrier in appropriate

---

[9]. The defendants correctly point out that Bethlehem Steel ultimately determined who held the seven shares it did not own. Since the Railroad was a Pennsylvania corporation, under Pennsylvania's corporation law, Bethlehem Steel, as the Railroad's controlling shareholder, selected the Railroad's directors. The directors, in turn, appointed the Railroad's officers, in whose names the seven shares were issued. 15 Pa. C.S.A. §§ 1502(a)(16), 1721, 1725(a).

circumstances, 49 U.S.C. § 11343, and in this case, the Interstate Commerce Commission sanctioned such control when it permitted Bethlehem Steel and the Railroad to acquire Bethran and Carrier Express.[10]

We thus hold that the companies in the Bethlehem Steel corporate family lacked the capacity to conspire with one another under section 1 of the Sherman Act.

2.      The Alleged Conspiracy Among the Bethlehem Steel Companies, Oak Management, Rediehs, Bryan and Carrier Express Agents

The plaintiffs also assert that a number of unnamed co-conspirators joined with one another and with the Bethlehem Steel companies in various combinations to restrain trade. We start with allegations which suggest that Thomas Rediehs, as an officer of Oak Management, and Kermit Bryan, as one of its employees, conspired with each other or with the company. In Copperweld the Court made clear that section 1 does not capture coordinated activity among the employees and officers of the same firm or police "internal agreements" between a corporation and these

_____

[10]. The plaintiffs further maintain that Copperweld is rendered inapplicable by a commitment in the petition Bethlehem Steel and the Railroad filed with the Commission to operate Bethran and Carrier Express separately, and by the Commission's order granting the petition on the "specifically-stated condition" of separate operation. Not only is the plaintiffs' characterization of the petition and the Commission's order plainly incorrect, but more importantly, under Copperweld, the control a parent corporation exercises over its subsidiary is relevant, not whether a parent operates the subsidiary separately.

individuals. Copperweld, 467 U.S. at 769; Tunis Bros. Co. v. Ford Motor Co., 763 F.2d 1482, 1496 & n.21 (3d Cir. 1985) ("A corporation can act only through its agents, thus the acts of corporate directors, officers, and employees on behalf of the corporation are the acts of the corporation and a corporation cannot conspire with itself."), vacated and remanded, 475 U.S. 1105 (1986), reinstated, 823 F.2d 49 (1987), cert. denied, 484 U.S. 1060 (1988).

We turn next to the plaintiffs' theory that a conspiracy existed among Carrier Express, its agents in the field, and Oak Management, and must determine whether a corporate principal and its agents should be treated as one enterprise or two. On another occasion, we were faced with a similar inquiry. In Weiss v. York Hospital, 745 F.2d 786 (3d Cir. 1984), cert. denied, 470 U.S. 1060 (1985), an osteopathic physician brought, both individually and as a class representative, an antitrust action under, inter alia, section 1 of the Sherman Act against the York Hospital, the York Medical and Dental Staff and ten individual physicians, alleging, inter alia, that the defendants had conspired to deny him staff privileges. Following trial, the jury found that only the staff had conspired against the plaintiff class. Upholding the jury's verdict in this regard, we held that the medical staff, comprised of individual, competing doctors, satisfied the plurality requirement of section 1, but that the staff as an entity, "operat[ing] as an officer of a corporation . . . [and having] no interest in competition with

the hospital", could not conspire with the hospital when making a staff privilege decision. Id. at 817.

In Pink Supply Corp. v. Hiebert, Inc., 788 F.2d 1313 (8th Cir. 1986), the Court of Appeals for the Eighth Circuit held that certain types of corporate agents, even if separately incorporated, are not capable of conspiring with their principal where their relationship necessarily involves a unity of economic interest and design. There, a dealer in office furniture manufactured by Hiebert whose dealership had been terminated commenced a section 1 antitrust action against Hiebert and four of its sales representatives, alleging a price-fixing and boycott conspiracy. At all relevant times, the sales representatives served as commissioned sales agents for Hiebert, generating business for the manufacturer by persuading potential customers to select the Hiebert line. They did not set prices, arrange terms of sales or accept orders, and did not compete in any sense with Hiebert or its dealers. Viewing the sales representatives as corporate agents who performed the tasks of employees and noting that they were an integral part of the corporate entity, the court concluded that Hiebert and the sales agents were so closely intertwined in economic interest and purpose as to amount to a unified economic consciousness incapable of an antitrust conspiracy. Id. at 1316.

When we examine the economic substance of the affiliation between Carrier Express and its agents in the field, as Copperweld instructs we must, we find a similar unity of interest and purpose. The agents, whose only function was to

make arrangements for the transport of Carrier Express freight with authorized carriers, did not compete with Carrier Express. As the conduit between Carrier Express and those with trucking equipment and drivers, the agents were an essential part of Carrier Express operations. Because the agents received a commission from Carrier Express based on the loads they arranged for the company to transport, the parties' economic interests were entirely congruent. In our view, therefore, Carrier Express and its agents represented a single enterprise.

We reach the same conclusion when we consider the relationship between Carrier Express and Oak Management. As Carrier Express did not have employees of its own, it used Oak Management to handle its day-to-day operations. Contractually obligated to manage Carrier Express affairs, Oak Management was, in effect, an inseparable part of Carrier Express' structure. Since its fee was a percentage of Carrier Express' revenue, Oak Management's economic well being was directly tied to Carrier Express' success. Oak Management did not compete with Carrier Express; instead, it stood to gain or lose from overseeing Carrier Express operations in an economical and efficient manner, as did Carrier Express itself. Hence, Carrier Express and Oak Management constituted one economic unit. Thus we hold that Oak Management and the Carrier Express agents could not conspire with Carrier Express or with each other under section 1, or for that matter, with Bethran or Bethlehem Steel.

B.

Our inquiry into the possibility of a conspiracy between Carrier Express and Oak Management, however, does not end here. The plaintiffs argue that even if Carrier Express and Oak Management were part of a single enterprise, they were capable of conspiring to terminate Siegel Transfer's contract with Carrier Express because Oak Management's representatives, Thomas Rediehs and Kermit Bryan, each had an interest in Rediehs Express.[11] The plaintiffs further maintain that Rediehs and Bryan were motivated to agree to the contract's termination so that Oak Management could replace Russell Siegel as Carrier Express' Baltimore agent.

These arguments call into question the exception to the general rule that a corporation cannot conspire with its employees, officers or agents that we and other courts of appeal have recognized.[12] In Johnston v. Baker, 445 F.2d 424, 427 (3d Cir. 1971), we concluded that a corporation can conspire with its agent where the agent acts for "personal reasons."[13] Although

_____

[11]. The plaintiffs do not allege that Rediehs Express itself, through Thomas Rediehs, Kermit Bryan or any other person, participated in this alleged restraint. They contend only that by virtue of Rediehs' and Bryan's respective interests in Rediehs Express, Oak Management was a separate entity with separate interests, capable of conspiring with Carrier Express.

[12]. In Copperweld, the Supreme Court observed without comment that "many courts have created an exception for corporate officers acting on their own behalf." 467 U.S. at 769-70 n.15, citing, inter alia, Johnston v. Baker, 445 F.2d 424 (3d Cir. 1971).

[13]. In Weiss v. York Hospital, 745 F.2d 786 (3d Cir. 1984), cert. denied, 470 U.S. 1060 (1985), we noted the exception but did not have occasion to discuss it. Id. at n.43. We again noted the exception in Tunis Bros. Co. v. Ford Motor Co., 763 F.2d 1482, 1496-97 (3d Cir. 1985), vacated and remanded, 475 U.S. 1105 (1986), reinstated, 823 F.2d 49 (1987), cert. denied, 484

the Court of Appeals for the Eighth Circuit, in <u>Morton Bldgs. of</u> <u>Neb. Inc. v. Morton Bldgs., Inc.</u>, 531 F.2d 910, 917 (8th Cir. 1976), held that the exception arises "when the officers or agents were, at the time of the conspiracy, acting beyond the scope of their authority or for their own benefit", the Court of Appeals for the Fourth Circuit, in <u>Greenville Pub. Co. v. Daily</u> <u>Reflector, Inc.</u>, 496 F.2d 391, 399 (4th Cir. 1974), determined that the exception "may be justified when the officer has an independent personal stake in achieving the corporation's illegal objective."

Over time, however, the exception expanded and came under criticism for threatening to swallow the general rule. <u>Oksanen v. Page Memorial Hosp.</u>, 945 F.2d 696, 705 (4th Cir. 1991), <u>cert. denied</u>, 502 U.S. 1074 (1992). <u>See</u> <u>Nurse Midwifery</u> <u>Assoc. v. Hibbett</u>, 918 F.2d 605, 613 (6th Cir. 1990), <u>modified by</u> 927 F.2d 904, <u>cert. denied</u>, 502 U.S. 952 (1991) (declining to adopt the "independent personal stake" exception for substantial policy reasons); 7 PHILLIP E. AREEDA, <u>ANTITRUST LAW</u>, ¶ 1471d&g (1986). Accordingly, our sister courts refined the exception to insure that it is appropriately applied. In <u>Pink Supply Corp. v.</u> <u>Hiebert, Inc.</u>, for example, when the plaintiff raised the exception, contending that one of Hiebert's sales representatives recommended that its dealership be terminated so as to control dealer pricing and bolster his own credibility, the Eighth

(..continued)
U.S. 1060 (1988), but because the factual issues relating to the exception were unresolved, we remanded the case to the district court for trial without analyzing the exception further.

Circuit refused to apply the exception, finding an absence of evidence in the record that the representative secured a direct financial gain from the plaintiff's elimination from the Hiebert organization:

> Our decisions have required more than mere speculation regarding the benefit to an agent to be realized from participation in a conspiracy with the principal. . . . Hiebert's sales representatives derived no financial benefit from the elimination of Pink Supply from the Hiebert organization. We construe "for the agent's own benefit" to mean at least an economic stake in the gain to be realized from the anticompetitive object of the conspiracy.

788 F.2d at 1318 (footnote omitted).

In Oksanen v. Page Memorial Hosp., an antitrust action arising out of the revocation of medical staff privileges, the plaintiff argued that even if a hospital and its medical staff were considered part of the same enterprise and incapable of conspiring, the exception applied because the individual doctors on the staff had personal stakes in the outcome of the peer review process. Addressing the plaintiff's argument, the Fourth Circuit expressly declined to extend the exception beyond the rationale underlying its prior decision in Greenville, where the president of the defendant company had a financial interest in a firm that competed with the plaintiff and the power to control the defendant's decisions. Oksanen, 945 F.2d at 705. The court of appeals thus examined whether the staff included members who directly benefitted from the plaintiff's elimination as a competitor, and whether the staff caused the hospital to engage

in the alleged restraint.  Id. at 705-06.  Finding that neither
of these criteria was met, the court concluded that the general
rule, and not the exception, controlled.  Id.[14]

In our view, in order for the concept of a conspiracy
between a principal and an agent to apply in the antitrust
context, the exception to the general rule should arise only
where an agent acts to further his own economic interest in a
marketplace actor which benefits from the alleged restraint, and

---

[14].    In his antitrust treatise, Professor Phillip E. Areeda
opines that the exception should, as a general proposition, only
capture an employee's pursuit of an outside interest which
competes with the plaintiff.  To do otherwise, Professor Areeda
maintains, would be unwise given the varied personal interests
that may motivate employees to act for themselves.  7 PHILLIP E.
AREEDA, ANTITRUST LAW § 1471e2 & n.27 (1986).

Professor Areeda also states that if an employee cannot
cause the employer to engage in the restraint, an independent
interest on his part is largely irrelevant to an antitrust
analysis:

> [T]he employee's "personal stake" bears on
> antitrust policy, if at all, only if it
> brings about an alleged restraint by his
> employer that would not otherwise have
> occurred.  The employer's self-interest may
> have been insufficient to induce the alleged
> restraint in the absence of the "conspiring"
> employee's independent interest.  The
> employee's independent interest is simply
> irrelevant to an employer act that would have
> occurred without regard to it.
>
> Thus, the premise for finding an
> employer-employee conspiracy is that an
> employee's personal stake causes the employer
> to adopt a restraint that would not otherwise
> have been adopted by the employer in his own
> self-interest.

Id. at § 1471d1.

causes his principal to take the anticompetitive actions about which the plaintiff complains.  In this way, the exception captures agreements that bring together the economic power of actors which were previously pursuing divergent interests and goals, the type of activity that section 1 was intended to oversee.  Copperweld, 467 U.S. at 752.

Our review of the record confirms that the exception as we have defined it does not apply in this case.  With regard to the respective interests that Rediehs and Bryan had in Rediehs Express, the plaintiffs did not offer any evidence to show that Rediehs Express competed with Siegel Transfer or that Rediehs Express would benefit from Siegel Transfer's elimination from the Sparrows Point market.  To the contrary, the defendants presented evidence which established that Rediehs Express did not haul steel products from Sparrows Point and that the tonnage of freight it received from Bethlehem Steel out of Burns Harbor declined following termination of Siegel Transfer's contract with Carrier Express.  Nor did the plaintiffs proffer any evidence to demonstrate that Oak Management, acting through Rediehs and Bryan, caused Carrier Express to terminate its contract with Siegel Transfer.  Again, the record is to the contrary, showing that James Matthews, Carrier Express' Vice President, possessed and retained the authority to decide such matters, and indeed exercised that authority in favor of contract termination.  At

most, Oak Management was asked to give Carrier Express advice.[15] The giving of advice, however, when requested by the decision maker, is not equivalent to making the decision. Pennsylvania Dental Ass'n v. Medical Serv. Ass'n., 745 F.2d 248, 259 (3d Cir. 1984), cert. denied, 471 U.S. 1016 (1985).

We also reject the plaintiffs' alternative argument regarding Rediehs' and Bryan's purported desire for Carrier Express' Baltimore agency. First, the record conclusively establishes that neither Rediehs nor Bryan sought the agency, and that Rediehs only reluctantly accepted it on Oak Management's behalf at Carrier Express' request. Second, Oak Management had nothing to gain, and indeed did not gain, from Siegel's ouster as a Carrier Express agent. Third, any losses that Siegel personally may have sustained are not relevant to the plaintiffs' case. Finally, Siegel's termination as a Carrier Express agent was a natural consequence of contract termination, an event that Oak Management did not cause or control.


V.

When we apply our conclusions regarding conspiratorial capacity to the evidence, and evaluate the undisputed facts of record, we find that the plaintiffs have failed to offer proof sufficient to establish the element of concerted action. With respect to their allegations that Bethlehem Steel, Bethran,

---

[15]. The record shows that Rediehs advised Carrier Express not to terminate its contract with Siegel Transfer, and that Bryan did not offer any advice one way or the other.

Carrier Express and Oak Management conspired on January 4, 1990 to end Siegel Transfer's contract with Carrier Express, we conclude that these companies constituted one economic unit which met to announce Carrier Express' decision to terminate the agreement. With regard to the plaintiffs' contention that Oak Management's instructions to Carrier Express' agents not to make transportation arrangements with Siegel Transfer constitute evidence of a conspiracy to exclude Siegel Transfer from the Sparrows Point market, we hold that this activity was undertaken by a single enterprise in order to implement the contract's termination.

As to the plaintiffs' complaint that the defendants combined with other parties to refuse Siegel Transfer the opportunity to haul freight for Bethlehem Steel, we find nothing more in the record than a unilateral, and under the antitrust laws, lawful choice on the part of one of Bethlehem Steel's transportation superintendents not to use Siegel equipment to transport products out of the company's Sparrow Point mill. Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 761 (1984) (A buyer or a seller "generally has the right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."). In addition, the record is uncontroverted that Bethlehem Steel, through other transportation managers, did indeed permit carriers with whom the company had direct business ties to use Siegel equipment to haul Bethlehem Steel freight after Carrier Express' termination of the Siegel Transfer contract. Further, although the plaintiffs suggested in their

brief that Rediehs Express assisted Carrier Express in a "horizontal restraint", they did not present a factual basis for this belief.  As we have stated, "[l]egal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985), cert. denied, 475 U.S. 1013 (1986).

Lastly, we conclude that the plaintiffs' contention that the refund contract between Carrier Express and Bethlehem Steel represents a per se violation of section 1 of the Sherman Act lacks merit.  Because the only parties to the contract were members of the Bethlehem Steel corporate family, the requisite element of concerted action is missing.  Moreover, we do not find any support for the plaintiffs' theory that a per se violation of the antitrust laws can be stated merely by alleging that an otherwise lawful arrangement is contrary to the "pro-competitive" polices of the Interstate Commerce Act.

VI.

In Count XI of the amended complaint, the plaintiffs claim that the defendants violated the Interstate Commerce Act and the Elkins Act.  According to the plaintiffs, Siegel Transfer's contract with Carrier Express was an unlawful "brokerage" agreement which improperly provided a "commission" to Carrier Express and a "rebate" to Bethlehem Steel; the refund agreement between Carrier Express and Bethlehem Steel amounted to another unlawful "rebate"; and Bethlehem Steel impermissibly

owned and controlled the operations of Bethran and Carrier Express.

Congress gave the Interstate Commerce Commission primary responsibility to enforce the Interstate Commerce Act, authorizing it to investigate infractions, compel compliance where violations have occurred, bring civil actions to enjoin certain violations, and enforce its orders and regulations. 49 U.S.C. § 11702. The Act also authorizes the Attorney General to enforce the Act upon the Commission's request, and to bring civil actions against common carriers for discriminatory practices. 49 U.S.C. § 11703.

In only a limited number of sections of the Act does Congress allow a private party to file suit in a court of law.[16] The plaintiffs do not cite to any of these sections in Count XI, nor do they apply in this case.

The other private action currently permitted under the Act involves "undercharge" claims, the allegation by a common carrier that it received a lower rate from a shipper than that filed with the Commission. See, e.g., Maislin Industries, U.S.

---

[16]. Section 11704 permits an interested person to enjoin an abandonment of service; section 11705 provides a private right of action to one injured in specified ways by certain carriers; section 11707 permits a private action against a common carrier for liability under receipts and bills of lading; and section 11708 allows a person to sue to enforce the Act's provisions relating to the issuance of operating certificates and permits. 49 U.S.C. §§ 11704–11705, 11707–11708.

We note also that the plaintiffs did not raise the question of an implied right of action under either the Interstate Commerce Act or the Elkins Act.

v. Primary Steel, 497 U.S. 116 (1990).  Because contract carriers are exempt from the tariff filing and uniform rate requirements of the Act, Central and Southern Motor Freight Tariff Assoc., Inc. v. United States, 757 F.2d 301 (D.C. Cir.), cert. denied, 474 U.S. 1019 (1985), there is no basis for an undercharge claim in this, a motor contract carrier case.

The Elkins Act, the other statute upon which the plaintiffs rely, does not regulate motor contract carriers or provide for private remedies.  49 U.S.C. §§ 11901–11903, 11915–11916.

We therefore find that the district court correctly dismissed the plaintiffs' federal transportation law claims for lack of subject matter jurisdiction because neither the Interstate Commerce Act nor the Elkins Act grants the plaintiffs the right to pursue their allegations in a federal court. Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804 (1986) (the existence of a private cause of action is a jurisdictional requirement).

VII.

We turn finally to the plaintiffs' state law claims. Because the plaintiffs failed to establish the antitrust claim they brought under federal law, their Maryland Antitrust Act claim also fails.  Natural Design, Inc. v. Rouse Co., 302 Md. 47, 53, 485 A.2d 663, 666 (1984) (the Maryland courts follow the federal courts' interpretations of section 1 of the Sherman Act when evaluating state antitrust claims).  Likewise, the

plaintiffs' civil conspiracy claim is deficient for failing to establish that the defendants engaged in an unlawful conspiracy. Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 211, 412 A.2d 466, 472 (1979) (under Pennsylvania law, the essential elements of civil conspiracy include malice and proof of a combination or agreement by two or more persons to do an unlawful act or to use unlawful means to accomplish an otherwise lawful act).[17]

In their breach of contract claim, the plaintiffs contend that Carrier Express' January 4, 1990 notice of contract termination was ineffective because the contract required that notice be given by December 4, thirty days before the contract's January 4 renewal date. The defendants argue that the contract renewed from year to year, with resulting yearly obligations, but that the year term could be cut short at any time by either party upon proper notice.[18]

---

[17]. The district court analyzed the civil conspiracy claim under Pennsylvania law. On appeal, both parties applied Pennsylvania law to this claim.

[18]. The contract's termination provision provided:

> (13) This AGREEMENT is to become effective January 4, 1986 and shall remain in effect for a period of three yrs from such date, and from year to year thereafter, subject to the right of either party hereto to cancel or terminate the AGREEMENT at any time upon not less than thirty (30) days written notice of one party to the other. (emphasis in original).

In Maryland,[19] the courts interpret written contracts that are clear and unambiguous. <u>Rothman v. Silver</u>, 245 Md. 292, 296, 226 A.2d 308, 309 (1967). The cardinal rule in the interpretation of contracts is that effect must be given to the intention of the parties, <u>Kasten Constr. Co., Inc. v. Rod Enterprises, Inc.</u>, 268 Md. 318, 328, 301 A.2d 12, 18 (1973), and to all provisions of the agreement. <u>Rothman</u>, 245 Md. at 296, 226 A.2d at 309. When the language of a contract is clear, the true test of what is meant is not what one of the parties to the contract understood it to mean, but what a reasonable person in the position of the parties would have thought it meant. <u>Kasten Constr.</u>, 268 Md. at 329, 301 A.2d at 18.

In our view, the plaintiffs' interpretation of the contract is strained, ignores the "at any time" termination language and adds a notice period that the contract did not have. The defendants' interpretation, on the other hand, is reasonable and gives meaning to all of the contract's provisions. We therefore find that the district court did not err in holding that the defendants' January 4, 1990 notice of termination complied with the terms of the parties' contract.

The plaintiffs also argue that Carrier Express failed to honor the thirty-day notice period. The record and the contract itself belie this argument. On January 4, 5 and 12, 1990, Carrier Express offered Siegel Transfer more than 600,000

---

[19]. The district court determined that Maryland law applies to the plaintiffs' contract claims. Neither party disagreed with the court's choice of law on appeal.

pounds of freight to transport. While the plaintiffs contend that arrangements for transport of this freight were made prior to January 1, 1990, the fact remains that Carrier Express' offer and Siegel Transfer's transport occurred in January 1990. The plaintiffs also assert that the parties' agreement required a minimum of twenty-five loads a day. To the contrary, the contract expressly obligated Carrier Express to offer "a minimum quantity of 30,000 pounds per year for each year this Agreement remains in effect."[20]

Finally, we agree with the district court that the plaintiffs' claim for breach of the implied duty of good faith must fail because the claim amounts to no more than an impermissible attempt on their part to alter the termination provision of the contract. Parker v. Columbia Bank, 91 Md. App. 346, 365, 604 A.2d 521, 531 (1992) (the duty of good faith and fair dealing is an implied term, but this duty "simply prohibits one party to a contract from acting in such a manner as to prevent the party from performing his obligations . . . .").

VIII.

For the foregoing reasons, we will affirm the district court's grant of summary judgment on Counts I, II, III, IV, VII,

---

[20]. The plaintiffs' additional claim that the contract was not a "trip lease" and their discussion regarding the necessary elements of a motor carrier agreement under the Interstate Commerce Act are not relevant, and do not alter the fact that the defendants properly exercised the termination right they had under the contract.

VIII and XI in the defendants' favor, and the court's dismissal of the federal claims in Count XI of the plaintiffs' Amended Complaint.