**Arnold PALMER et al., Plaintiffs,**

v.

**GOTTA HAVE IT GOLF COLLECTIBLES, INC., and Bruce Matthews, Defendants/Third Party Plaintiffs,**

v.

**International Management, Inc. d/b/a International Management Group, Third Party Defendant.**

**No. 97–0978–Civ.**

United States District Court, S.D. Florida.

June 22, 2000.

---

James Miller Kaplan, Anne T. Cirasuolo, Wilson Elser Moskowitz Edelman & Dicker, Miami, FL, Jeffrey L. Laytin, Lewin & Laytin, New York, NY, for Arnold Palmer Enterprises, Inc., Arnold Palmer, ETW Corp., Eldrick Woods.

Robert George Haile, Jr., Fleming Haile & Shaw, North Palm Beach, FL, James Miller Kaplan, Anne T. Cirasuolo, Wilson Elser Moskowitz Edelman & Dicker, Miami, FL, Jeffrey L. Laytin, New York, NY, for Golden Bear Intern., Inc., Golden Bear Golf, Inc., Jack Nicklaus.

Teresa Ragatz, Eric David Isicoff, Isicoff & Ragatz, Miami, FL, for Gotta Have It Golf Collectibles.

Michael C. Rotunno, Marlow Connell Valerius Abrams Adler & Newman, Miami, FL, for International Management Group, Inc.

## ORDER GRANTING IN PART SUMMARY JUDGMENT ON THIRD–PARTY CLAIMS

SEITZ, District Judge.

THIS CAUSE is before the Court on the Third–Party Defendant International Management, Inc.'s Motion for Summary Judgment [D.E. 405]. After hearing oral argument on the motions, and for the reasons set forth below, the Court denies that motion as to Counts IV and V (defamation) and grants it as to all other Counts (antitrust, tortious interference, civil theft, negligence).

### UNDISPUTED MATERIAL FACTS

A. *The Parties.*

Plaintiffs Arnold Palmer, Jack Nicklaus, and Tiger Woods are world famous golfers. Both Palmer and Nicklaus own registered trademarks; Woods has none. Plaintiffs Arnold Palmer Enterprises, Inc. ("AP Enterprises"), Golden Bear Golf, Inc., and ETW Corporation are the golfers' respective licensing and business entities. Palmer is an owner and employee of AP Enterprises, Nicklaus is the Chairman of Golden Bear Golf,[1] and Woods is the Chairman of ETW Corporation.

Third-party Defendant International Management Group ("IMG") is the world's largest sports and celebrity representation business firm, and acts as agent for both Palmer and Woods. It is undisputed that Nicklaus has no business relationship with IMG. IMG receives compensation in connection with licensing and business opportunities entered into by AP Enterprises and ETW Corporation. Specifically, IMG earns a commission on Palmer's professional golf earnings, excluding Palmer's endorsements, and a percentage of ETW Corporation's earnings, including Wood's endorsements. There is an overlap of personnel between IMG and ETW Corporation, and also IMG and AP Enterprises. For instance, John Oney, who is the Associate Counsel and Vice President of IMG, is also an uncompensated officer of both ETW Corporation and AP Enterprises. The Senior Executive Vice President of IMG, Alastair Johnston, is also the chief operating officer of AP Enterprises as Palmer's personal manager. Woods' agent, Hughes Norton of IMG, is also an officer of ETW Corporation.[2]

Defendant Gotta Have It Golf Collectibles, Inc. ("Gotta Have It") is a sports memorabilia retailer which specializes in golf-related merchandise and is wholly owned by Defendant Bruce Matthews.[3] Sales of autographs and photographs of professional golfers Palmer, Nicklaus, and Woods account for a substantial portion of Gotta Have It's sales. Gotta Have It obtains the autographs and photographs it sells from various sources, then combines

---

1. Nicklaus is also the CEO and President of Plaintiff Golden Bear International, Inc., the company that designs and develops golf courses. Prior to the formation of Golden Bear Golf in August 1996, Golden Bear International held the licensing and endorsement rights for Nicklaus.

2. Norton was Woods' personal manager until September 1998.

3. When referring to the Defendants herein, the Court shall use the designation "Gotta Have It" to mean the Defendants Gotta Have It and Bruce Matthews, collectively.

them together in a matted and framed format, enhanced with engraved descriptive plaques. Gotta Have It's merchandise ranges in price from $75.00 to $5,000.00. Gotta Have It operates a showroom, but most of its sales are made at collectible shows and through its catalog.

### B. *Plaintiffs' Enforcement Activities.*

Beginning in late 1996, the Plaintiffs made a concerted, nationwide effort to stop the unauthorized sale of their images and alleged signatures in the memorabilia market. Plaintiffs (specifically, Golden Bear Golf, AP Enterprises, and ETW Corporation) retained the law firm of Lewin & Laytin (and specifically, Jeffrey Laytin, hereinafter "Laytin") to take steps to stop third parties from selling photographs and signatures of Palmer, Nicklaus, and Woods.[4] Laytin would identify persons who appeared to be engaged in unauthorized sales, and would then, after receiving approval from the Plaintiffs, serve a "cease and desist" letter on the alleged infringer.[5]

### 1. *Enforcement efforts as to Gotta Have It.*

As part of the enforcement process, Laytin utilized the services of a private investigator, Wayne Grooms ("Grooms"). On December 18, 1996, Grooms, acting upon the instructions of Laytin and Oney, ordered from Gotta Have It one autographed Arnold Palmer photograph, "Arnold Palmer On the Swilken Bridge," for $350.00.[6] The order was shipped directly to John Oney at IMG's offices in Cleveland, Ohio.[7] On March 4, 1997, Grooms ordered from Harold Roberts (Gotta Have It's Director of Tournament Operations,

hereinafter "Roberts") one unframed photograph of Arnold Palmer, Jack Nicklaus, and Tiger Woods with index cards ("cuts") bearing purported autographs of the individual golfers for $750.00. This photograph was also shipped to Oney. Oney and at least one other executive at ETW Corporation examined the signatures and believed them to be forged. The products were then forwarded, along with authentic signature exemplars provided directly by the individual golfers, to a handwriting expert, Steve Cain ("Cain"), for analysis. Subsequently, on April 4, 1997, Cain determined that the signatures of Nicklaus and Woods appearing on the March 4 cuts were "probable forgeries," and that "a strong possibility" existed that the signature of Palmer was also forged.

On March 27, 1997, Laytin sent a cease and desist letter on behalf of ETW Corporation and Woods to Gotta Have It. On March 28, 1997, Laytin spoke by telephone with Defendant Matthews and re-faxed the March 27, 1998, cease and desist letter. On Tuesday, April 1, 1997, Laytin sent Gotta Have It a follow-up to the March 27, 1997, cease and desist letter, advising that Laytin also represented Palmer, AP Enterprises, Nicklaus, and Golden Bear Golf, and demanding specifically that Gotta Have It cease and desist from sales of allegedly unauthorized merchandise at the TPC Sawgrass Tournament in Ponts Vedra. Florida, Gotta Have It never responded.

### 2. *Events at the 1997 Masters in Augusta, Georgia.*

On April 2, 1997, Grooms spoke with Scott Maurer ("Maurer"), the administra-

---

**4.** Laytin has never been retained by IMG. Further, at all relevant times, Oney's interactions with Laytin regarding Gotta Have It were solely in his capacity as Vice President of ETW Corporation and Vice President of AP Enterprises. Oney would keep Palmer and Woods apprized of the status of the enforcement actions through their personal agents, Norton and Johnston, respectively, of IMG.

**5.** Approximately seventy-five different memorabilia dealers were targeted between late

1996 and mid-1998. All of the vendors except Gotta Have It agreed to discontinue selling the merchandise.

**6.** Although IMG had knowledge of and input into the enforcement issues, all decision-making was done by Oney.

**7.** ETW Corporation used IMG's Cleveland-office as its own business address.

tive Director of Operations for Gotta Have It, who informed Grooms that Gotta Have It would be selling merchandise at the upcoming Masters tournament in Augusta, Georgia. On April 7, 1997, Grooms (acting on Laytin's instruction) arrived in Augusta, Georgia, and observed that Gotta Have It had set up three booths outside the grounds of Augusta National, the site of the Masters Tournament. Grooms purchased from one of Gotta Have It's booths a photograph of Arnold Palmer, Jack Nicklaus, and Tiger Woods with autographed cuts for $1,250.00. Grooms sent these cuts via overnight mail to Cain for analysis. Grooms also purchased autographed merchandise from a second vendor, American Legends, and forwarded the American Legends merchandise to Cain for analysis.

Cain received the April 7 Gotta Have It cuts and American Legends merchandise from Grooms on April 8, 1997. Cain then compared the April 7 cuts to previously supplied exemplars of Palmer's, Nicklaus's, and Woods' known signatures, and concluded that the signatures appearing on the April 7 Gotta Have It cuts were probable forgeries as well. Thus, on April 8, 1997, Cain executed an affidavit confirming that the signatures were probable forgeries and faxed the affidavit to Grooms in Augusta on that same day.[8]

Upon receipt of the affidavit on April 8, 1997, Grooms (acting again on the instructions of Laytin) informed Richmond County Police Chief Ronald Strength that the Plaintiffs' handwriting expert had determined that the signatures appearing on Gotta Have It and American Legends merchandise were forgeries.[9] On the morning of April 9, 1997, Grooms met with Chief Strength and two of his investigators, Officers Randy Hayes and Pat Stahler, at the entrance to the Masters, and presented the officers with the Cain affidavit and Cain's resume, along with a handwritten report prepared by Grooms providing the background of the case. After reviewing the evidence proffered by Grooms, Chief Strength concluded that probable cause existed that Gotta Have It and American Legends were in violation of Georgia law. Accordingly, Officers Stahler and Hayes proceeded to arrest two employees of American Legends and then arrested Maurer and Roberts of Gotta Have It. The arrest warrants only named Palmer and Woods as the victims, as Nicklaus had previously advised Laytin that he did not want to be a part of the criminal proceedings.

The four arrestees were charged with felony forgery and/or counterfeiting of trademarks or registered designs under Georgia Criminal Statute 10–1–454, and were brought to the Richmond County Jail. They were subsequently released on bail. Sixty (60) items of Gotta Have It merchandise and thirty-four (34) items of American Legends merchandise were seized at the time of the arrests, all of which contained photographs and/or autographs of Palmer and Woods. At the instruction of Laytin and with the assistance of Grooms, approximately thirty-five (35) items from the confiscated goods were dismantled and sent to Cain for analysis.[10]

---

**8.** Cain reached the same conclusion as to the American Legends' items, and prepared a similar affidavit in that regard.

**9.** Oney, who authorized the consultation with local law enforcement officers, testified that:

If the material had been simply unlicensed photographs, simply unlicensed photographs we would not have contacted the prosecutor at all and we would have treated that simply as a commercial matter and the only reason we contacted the prosecutor is because so much of the material had forged signatures and because of the forged signatures there were very high prices being charged. We knew ordinary consumers were walking into the tent at Augusta and paying a large amount of money for something we strongly believed with good evidence was all forged signatures so it was only that reason.

**10.** At least one of the items sent to Cain (a golf ball signed by Palmer) was determine to be "probably authentic."

On April 10, 1997, Gotta Have It employees Maurer and Roberts returned to the Masters and "set up business as usual," staffing their tents and selling their remaining merchandise. Subsequently, the criminal charges against American Legends were dropped. The charges against Maurer and Roberts were never pursued further and no indictment ever issued.

### 3. Post-arrest publicity.

Prior to the planned criminal arrests, Grooms notified Mr. Beverly Norwood ("Norwood"), IMG's Vice President of Golf Publishing, and Tiger Woods of the impending law enforcement action. In turn, Norwood, acting solely in his capacity as representative of Woods, contacted Jerry Tarde ("Tarde"), an editor of *Golf Digest* magazine, and advised Tarde that Woods was planning to take action against sellers of unlicensed memorabilia at the Masters, including Gotta Have It, by asking law enforcement officers to arrest them and confiscate their merchandise. Norwood further advised Tarde that the action was scheduled to take place "on Wednesday [April 9, 1997] at ten a.m." Norwood stated that he had advised Tarde of the arrests because "the subject of Tigermania, as it's called, is something that has been of interest to *Golf Digest* all along, which included the sale of various merchandise." After Tarde expressed interest in covering the arrests, Norwood agreed to meet with a *Golf Digest* writer and photographer at a specified location at the Masters. The *Golf Digest* team then documented the arrests. It is undisputed that Norwood alerted no other media to the arrest and seizure; nor did he ever discuss Gotta Have It with any member of the media

prior to the seizure, other than *Golf Digest*.

Following the arrests, three separate articles reporting the events in Augusta were published. The first article was the *Golf Digest* coverage of the arrests, which was published on April 18, 1997. The article stated that Georgia law enforcement officers "working on tips from representatives of Woods and Arnold Palmer arrested four men . . . and seized almost $70,000 in goods that the players' agents said contained bogus signatures." Alastair Johnston, Palmer's personal agent at IMG, was quoted as stating "It's a big business. We hope it's a warning to others." Laytin was quoted as stating "Fans were spending $500 to $2,500 for fakes." [11]

The second article appeared in the April 25, 1997, *Miami Daily Business Review,* addressing the lawsuit Plaintiffs filed against Gotta Have It. Oney, as associate counsel for IMG, was quoted as saying "We were just shocked. We knew there was no way they [the golfers] could be signing this stuff." The article also covered the Masters' incident, noting that IMG alerted the local law enforcement officers as to the alleged forgeries. Oney further commented that "One of the main reasons we are upset about it is when someone finds out later it is fake, they will be mad at the infringer, but they don't know who the infringer is; but a little bit of them will be mad at the golfer, and we don't want that to happen." The article also attributes the following statements to Oney: "neither Woods nor Palmer signs products to make money," and "two representatives of Gotta Have It were arrested [at the Master's Tournament]." [12]

---

11. Laytin subsequently testified that he had made this statement based on his personal knowledge of the prices of collectible merchandise being sold at the tournament—samples purchased by Mr. Grooms were priced at $350, $750, and $1,500; on Grooms' reports, and on the sworn opinion of Cain (as relied upon by Georgia law enforcement officers) that the signatures appearing on Gotta Have

It's merchandise he had examined were probable forgeries.

12. A follow-up article appearing in the August 22, 1997, *Miami Daily Business Review* stated that "Laytin contends that Woods, Palmer and Nicklaus never sign products to make money, and that the signatures on Gotta Have It's collectibles are fakes."

The final article appeared in the May 9, 1997, *Sports Collector's Digest.* The article specifically identified Gotta Have It and quoted Oney as saying "In the course of buying fake Arnold Palmer golf balls, they would offer to sell us Tiger Woods golf balls, and we bought those too. We did the handwriting analysis and we found those were fake, and Tiger was equally upset that while he's trying to start his career on a positive note, here are people making money off of him in the most dishonest way possible, and cheating Tiger's fans."

The event was also broadcast on the Augusta local news. Gotta Have It was specifically named in the broadcast as one of the vendors arrested for selling forged autographed pictures of Woods and Palmer. The broadcast pictured and named Mauer and Roberts as two of the arrestees. The reporter stated that the police learned of the forgeries because "representatives of Tiger Woods and Arnold Palmer" had called the District Attorney's office in Georgia.

*4. The aftermath.*

Defendant Matthews claims that as a result of the negative exposure on national television and a "smear campaign" branding Gotta Have It and its employees as "counterfeiters" and "con artists," his reputation has been damaged and Gotta Have It's business relationships (set out below) have suffered.

(a) *Tournaments.* In the past, Gotta Have It has leased vendor space at four professional golf tournaments: the J.C. Penney Classic, the GTE Sun Classic, the American Express Invitational, and the Doral–Ryder Open. Gotta Have It paid to the tournaments a fee in exchange for the right to display and sell products during the specific tournaments. The term of each contract with the J.C. Penney Classic, the GTE Sun Classic, and the American Express Invitational lasted only for the duration of the particular tournament, generally one week or loss; none of the tournaments had a multi-year contract with Gotta Have It.

The J.C. Penney Classic permitted Gotta Have It to display and sell merchandise at the 1997 and 1998 tournaments, both of which occurred after this civil action commenced and after the Classic had become aware of the Masters incident through the press.[13] The J.C. Penney Classic has never received any complaints regarding Gotta Have It merchandise. In the past, the J.C. Penney Classic would allow Gotta Have It to sell off items at the silent auction to raise money to cover the cost of the tournament participation fee. That practice, however, was discontinued because the charities (whom the auction proceeds were to benefit) did not want the money raised in the auction to go to anyone other than themselves.

Although Gotta Have It was allowed to set up a booth at the 1996 American Express Invitational, it was not allowed to participate in the 1997 tournament solely due to space limitations and a change in policy. No other memorabilia vendors were allowed to participate in those tournaments either.[14] Similarly, the GTE Suncoast Classic turned down Gotta Have It's request to set up vendor booths at the 1997 tournament because Gotta Have It failed to submit information requested by its director, Denny Antram, showing that Gotta Have It had proper authorization from the players whose photographs they sold.

---

**13.** The J.C. Penney Classic allowed Gotta Have It to participate because it was assured by Roberts that Gotta Have It would provide evidence of authenticity to prospective customers.

**14.** The 1996 tournament was the one and only time any vendor was allowed to sell merchandise at the American Express Invitational tournaments, with Gotta Have It being the sole vendor at that tournament. In 1997, the booth Gotta Have It had been assigned in prior years was assigned to the Players' Association to obtain pledges for charitable donations to fight prostate cancer.

It is undisputed that neither the Plaintiffs nor IMG contacted the J.C. Penney Classic, the GTE Sun Classic, or the American Express Invitational regarding Gotta Have It, and that they never advised those tournaments to cease doing business with Gotta Have It, or that Gotta Have It was dealing in unauthorized or forged goods.

For years, Gotta Have It has participated in the Doral–Ryder Open as a display tent sponsor. In December 1998, Gotta Have It was informed that it would not be able to participate in the 1999 Open as a decision had been made to use only a PGA Tour-licensed memorabilia company (in that case, ProTour Memorabilia). No evidence has been presented that the Open's decision was precipitated by conduct on the part of the Plaintiffs or IMG.

(b) *Doral consignments.* Gotta Have It has in the past, pursuant to an oral agreement, consigned merchandise to the Doral Country Club, which would display and offer for sale the merchandise in its pro shop and in its "Champions Bar and Grill." If sold, Gotta Have It would receive payment based on the purchase price. Mr. Friedlander, Director of Golf at the Doral Country Club, terminated the consignment arrangement with Gotta Have It in February 1997, two months prior to the criminal enforcement action, because of his general dissatisfaction with the agreement stemming from a billing dispute between the Doral Country Club and Gotta Have It. Gotta Have It is "not sure of the real reason" why the consignment relationship between Doral and Gotta Have It was terminated.

At no time has Friedlander or anyone from his office had contact (written or oral) with any of the Plaintiffs or with IMG regarding Gotta Have It. Thus, it is undisputed that neither the Plaintiffs nor IMG or their representatives have ever advised Friedlander not to do business with or take consignments from Gotta Have It, or that Gotta Have It was dealing in unauthorized merchandise or forged signatures.

(c) *Make–A–Wish auction.* Make–A–Wish is a charitable organization that provides wishes to children with terminal or life threatening illnesses. In connection with its Annual Sports Banquet fund-raiser, Make–A–Wish on at least one occasion auctioned memorabilia by Gotta Have It. Make–A–Wish had no contractual relationship* with Gotta Have It other than either to pay a consignment fee for auctioned merchandise, or to return any unauctioned or unsold merchandise.

■ The only contact the Make–A–Wish Foundation's offices in Florida have had regarding Gotta Have It was a call from a person, the identity of whom was not known, who advised Make–A–Wish that an autographed Arnold Palmer photograph, obtained by Make–A–Wish from Gotta Have It and auctioned at the Make–A–Wish Sports Banquet, was possibly forged.[15] The caller asked if Make–A–Wish could contact the person who purchased the photograph at the auction and request that they return the photograph in order to authenticate the signature; if the signature proved false, the caller indicated that a replacement would be provided. The caller did not claim that Gotta Have It dealt in forged or unauthorized merchandise, and did not suggest that Make–A–Wish cease doing business with Gotta Have It, or take any action with respect to Gotta Have It. Make–A–Wish thereafter contacted the purchaser of the Gotta Have It piece, who indicated that he had given the piece away, and had no interest in

---

**15.** Defendant Matthews asserts that the person who originally took the call told him it was a representative of IMG that had called Make–A–Wish. Matthews has presented an undated copy of a telephone message slip stating that "Sharon Novak of Make a Wish Foundation" called. The message further states on the line designated for the telephone number of the caller "IMG–issue." Without more, such evidence is pure hearsay and, thus, is insufficient to defeat summary judgment where, as here, no showing has been made that such evidence can be reduced to an admissible form at trial. *Macuba v. Deboer,* 193 F.3d 1316, 1322–23 (11th Cir.1999).

returning it for authentication. Make–A–Wish thus took no further action on the issue, There is no admissible evidence in the record linking the unidentified caller to either the Plaintiffs or IMG. Defendant Matthews could not recall whether Gotta Have It has donated goods to Make–A–Wish since the alleged telephone call was made.

(d) *Famous Photography supplier.* Gotta Have It has also had an on-going business relationship with Famous Photography, from whom Gotta Have It would purchase photographs for resale. Gotta Have It's arrangement with Famous Photography was a buyer/seller relationship for photographs: typically, Gotta Have It purchased photographs from Famous Photography (though, on occasion, Famous Photography would also purchase from Gotta Have It). The only change in the business relationship between Famous Photography and Gotta Have It relevant to this lawsuit occurred in March, 1998, when Famous Photography changed its policy from automatically filling orders placed by Gotta Have It to having the president review and approve any Gotta Have It order before it would be filled. This policy has been enacted with several other Famous Photography customers in addition to Gotta Have It. Famous Photography implemented its "prior approval" policy with respect to Gotta Have It in March, 1998, for a variety of legitimate and reasonable business reasons, none of which were the result of contact from the Plaintiffs and/or IMG regarding Gotta Have It. Since the policy was instituted, Famous Photography has continued to do business with Gotta Have It.

One of the reasons for Famous Photography's change in policy was the establishment of a licensing agreement between Famous Photography and the Associated Press. Famous Photography was uncomfortable selling Associated Press pictures to Gotta Have It because it had learned that the Associated Press had sued Gotta Have It over Gotta Have It's alleged unauthorized sale of improperly obtained Associated Press pictures. Based on this knowledge, Famous Photography did not want to risk straining its agreement with the Associated Press and therefore decided not to sell Associated Press photos to Gotta Have It.[16]

Famous Photography's second reason for instituting the "prior approval" policy was due in part to the criminal action arising out of the Masters' incident, of which it learned through the media. Famous Photography was concerned that continued dealings with Gotta Have It, in light of the arrests, would "affect[ ] our relationship with our suppliers." In addition, Famous Photography was interested in entering into and/or continuing an ongoing business relationship with the Plaintiffs. Thus, the president of Famous Photography wanted to be made aware of all dealings with Gotta Have It. It is undisputed, however, that Famous Photography has never spoken with either the Plaintiffs or IMG or their representative regarding Gotta Have It or Matthews.

(e) *Edwin Watts' Golf Shop consignments.* In late 1996, the Edwin Watts Golf Shops agreed to accept Gotta Have It's golf memorabilia on a consignment basis for sale in its stores. Gotta Have It's products were initially placed in the Orlando Super Store. Due to the success of the products, Edwin Watts commenced discussions with Gotta Have It to place Gotta Have It's products in its stores around the country. Subsequently, however, Edwin Watts "became aware" of the Masters incident. Because Edwin Watts could not afford to do business with someone accused of selling forgeries, it removed all of Gotta Have It's products from the display in the Orlando store, returned all unsold merchandise, and ceased all plans

---

**16.** Nevertheless, Gotta Have It continues to obtain Associated Press photographs indirectly from Famous Photography through a third party middleman, Tim Thorn d/b/a Frame It Right, who orders the Associated Press copyrighted photos directly from Famous and then ships them to Gotta Have It.

to expand their relationship with Gotta Have It. No evidence has been presented that Edwin Watts had any communications with Plaintiffs or IMG regarding Gotta Have It.

(f) *Gotta Have It's sales.* It is undisputed that Gotta Have It's sales over the past year have nearly tripled, with sales increasing by over $1.2 million from 1996 to 1997. Specifically, Gotta Have It's 1997 sales totaled $1.740,360.16, up from $576,399.41 in 1996. Gotta Have It's per-tournament sales volume for each year from 1996 to 1998 has remained about the same, at $3,000.00 to $16,000.00 per tournament. In addition; Gotta Have It has attended roughly the same amount of tournaments each year: approximately 28 in 1996 and 30 in 1997. At the time of Roberts' deposition on May 7, 1998, Gotta Have It expected to attend between 25 and 28 tournaments in 1998. Gotta Have It's accountant, however, opined that Gotta Have It "has suffered substantial reduction in its pattern of growth in both gross receipts and net income and that its lost profits, including lost future profits, exceed $8 million." Despite this expert opinion, Defendant Matthews has not been able to identify a single lost sale attributable either to publicity surrounding the arrests at Augusta or to alleged tortious interference by the Plaintiffs or IMG.[17]

### *PROCEDURAL BACKGROUND*

In April 1997, Plaintiffs filed a seven-count complaint alleging: federal trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114 [Count I]; unfair competition/false endorsement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) [Count II]; unfair competition/false advertising in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) [Count III]; federal dilution of trademark in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(c)(1) [Count IV]; Florida common law unfair competition [Count V]; Florida trademark dilution in violation of Section 495.151, Florida Statutes [Count VI]; and unauthorized publication of name and likeness in violation of Section 540.08, Florida Statutes (Florida's "Right of Publicity" statute) [Count VII]. Plaintiffs seek treble damages, an amount equal to Gotta Have It's profits, punitive damages, attorney's fees, and costs.

In response, Gotta Have It filed a counterclaim. Gotta Have It also filed a third-party complaint, adding IMG as a party-defendant. In the counterclaim and third-party complaint (as amended on August 27, 1997), Gotta Have It asserts claims for restraint of trade in violation of Section 1 of the Sherman Act [Count I]; attempted monopolization in violation of Section 2 of the Sherman Act [Count II]; conspiracy to monopolize in violation of Section 2 of the Sherman Act [Count III]; defamation [Count IV]; conspiracy to defame [Count V]; tortious interference [Count VI]; conspiracy to tortiously interfere [Count VII]; civil theft [XII]; and negligence [Count XIII]. Defendant have also filed a claim for declaratory relief to 28 U.S.C. § 2201 [Count XIV].[18] In addition to a declaratory judgment, Defendant seek actual damages, including lost profits and lost future profits, punitive damages, attorney's fees, and costs.[19]

---

**17.** Indeed, the only basis for Matthews' knowledge regarding the tortious interference claims is what his employee, Roberts, told him. In other words, Matthews relies on hearsay in an attempt to defeat summary judgment. Again, however, such evidence is insufficient for this purpose. *See Macuba,* 193 F.3d at 1322–23.

**18.** Counts VIII through XI were dismissed by prior order of the Court on June 1, 1998.

**19.** Plaintiffs and Gotta Have It filed separate motions for summary judgment as to Plaintiffs' claims, which motions have been resolved by prior order. In addition, Plaintiffs have filed a motion for summary judgment on Gotta Have It's counterclaims. That motion shall likewise be addressed in a separate order.

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Turnes v. AmSouth Bank,* 36 F.3d 1057, 1060 (11th Cir.1994). The evidence and all reasonable factual inferences drawn from that evidence are viewed in the light most favorable to the non-movant. *Allen v. Tyson Foods, Inc.,* 121 F.3d 642 (11th Cir. 1997).

## ANALYSIS

A. *Sherman Act Claims (Counts I, II and III).*

Counts I and III of Gotta Have It's Third Party Complaint asserts that IMG, together with the Plaintiffs, acted to restrain trade by: (a) demanding that Gotta Have It cease engaging in business by asserting non-existent rights under the Lanham Act; (b) orchestrating and implementing the criminal arrest of Gotta Have It employees and seizing its inventory; and (c) engaging in a smear campaign designed to interfere with Gotta Have It's business relationships and to destroy its business reputation and to eliminate competition. In Count II, Gotta Have It further contends that such conduct also violates the Sherman Act's prohibition against attempted monopolization and conspiracy to monopolize.

1. *Conspiracy under the Sherman Act (Counts I and III).*

■ The Sherman Act makes it illegal to conspire, contract, or otherwise combine to restrain trade across state or national borders. 15 U.S.C. § 1. To prevail on its Sherman Act restraint of trade claims, Gotta Have It must prove "(1) an agreement to enter a conspiracy (2) designed to achieve an unlawful objective" and (3) "actual unlawful effects." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 1001 (11th Cir.1993). As to the first element, "[p]roof of concerted action requires evidence that two or more distinct entities agreed to take action against a plaintiff." *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1131 (3d Cir.1995). In determining whether certain entities are distinct, the court must look to "the substance, and not the form, of economic arrangements." *Id.* at 1133 (citing *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 772–73, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)). Generally, however, a corporation cannot conspire with its employees, officers or agents. *Id.* at 1135. *See also Nelson Radio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911, 914 (5th Cir.1952)(applying the intra-corporate conspiracy doctrine).[20]

In *Siegel Transfer,* a motor carrier company brought a Sherman Act claim against a shipper (Bethlehem Steel) and its subsidiaries. One of the subsidiaries of Bethlehem Steel—Carrier Express (a motor carrier/broker)—was engaged to haul Bethlehem Steel's products. Having no employees of its own, Carrier Express used commissioned, non-exclusive agents to make arrangements with owner-operators or with carriers who had access to trucks and drivers to carry the freight it was under contract to transport. A separate entity—Oak Management, Inc.,—managed Carrier Express. Specifically, Oak Management was responsible for the day-to-day functions of Carrier Express and received a percentage of Carrier Express' revenues as payment for its services. A Vice President of Carrier Express (Thomas Rediehs) was also the

---

**20.** The intra-corporate conspiracy doctrine also applies to claims under Section 2 of the Sherman Act asserting conspiracy to monopolize. *See, e.g., Schueller v. Norman,* 1994 WL 837091 at \*21 (W.D.Ark. Apr. 8, 1994), *aff'd,* 46 F.3d 1136 (8th Cir.), *cert. denied,* 516 U.S. 862, 116 S.Ct. 171, 133 L.Ed.2d 112 (1995); *Pudlo v. Adamski,* 789 F.Supp. 247, 252 (N.D.Ill.1992), *aff'd,* 2 F.3d 1153, 1993 WL 306105 (7th Cir.1993), *cert. denied,* 510 U.S. 1072, 114 S.Ct. 879, 127 L.Ed.2d 75 (1994).

owner and President of Oak Management. *Id.* at 1128.

Oak Management also managed the operations of another carrier/broker—Rediehs Express. Rediehs Express was owned by the wife and children of Thomas Rediehs. The Operations Manager of Rediehs Express (Kermit Bryan) was also the Executive Vice President of Oak Management. Rediehs Express did some business with Carrier Express and also hauled Bethlehem Steel products out of the shipper's Indiana plant. *Id.*

In order to carry out its contract with Bethlehem Stool, Carrier Express entered into a contract with the plaintiffs for carrier services at Bethlehem Steel's Baltimore plant, *Id.* The contract was subsequently terminated, however, due to concerns over certain driving accidents the plaintiffs suffered. Another Vice President of Carrier (James Matthews) made the contract termination decision. In addition to informing the defendants' other management personnel of his decision, Matthews discussed his decision with Rediehs and Bryan. Matthews, Rediehs, Bryan, and William Van Heel, a manager with Bethlehem Steel and director of Bethlehem Steel's other subsidiary, Bethran, Inc. (also a motor carrier), then met with the plaintiffs to inform them of the contract termination, Subsequently, at Carrier Express' direction, Oak Management commenced instructing Carrier Express agents that the contract with the plaintiffs had been terminated and that the plaintiffs were no longer authorized to carry Carrier Express freight, *Id.* at 1129.

The plaintiffs in *Siegel Transfer* filed suit, alleging, *inter alia*, that Carrier Express, its agents in the field, and Oak Management conspired together to restrain trade in violation of Section 1 of the Sherman Act. The district court granted summary judgment in favor of the defendants on that claim, finding that plaintiffs had failed to show that two or more economic actors conspired against them. *Id.* at 1130. The Third Circuit Court of Appeals affirmed, holding that "Oak Management and the Carrier Express agents could not conspire with Carrier Express or with each other under section 1, or for that matter, with Bethran or Bethlehem Stool." *Id.* at 1135, 1140. In affirming as to Carrier Express and its field agents, the Third Circuit reasoned that:

> When we examine the economic substance of the affiliation between Carrier Express and its agents in the field, as *Copperweld* instructs we must, we find a similar unity of interest and purpose. The agents, whose only function was to make arrangements for the transport of Carrier Express freight with authorized carriers, did not compete with Carrier Express, As the conduit between Carrier Express and those with trucking equipment and drivers, the agents were an essential part of Carrier Express operations. Because the agents received a commission from Carrier Express based on the loads they arranged for the company to transport, the parties' economic interests were entirely congruent. In our view, therefore, Carrier Express and its agents represented a single enterprise.

*Id.* at 1135. As to Oak Management, the court in *Siegel Transfer* held:

> We reach the same conclusion when we consider the relationship between Carrier Express and Oak Management. As Carrier Express did not have employees of its own, it used Oak Management to handle its day-to-day operations. Contractually obliged to manage Carrier Express affairs, Oak Management was, in effect, an inseparable part of Carrier Express' structure. Since its fee was a percentage of Carrier Express' revenue, Oak Management's economic well being was directly tied to Carrier Express' success. Oak Management did not compete with Carrier Express; instead, it stood to gain or lose from overseeing Carrier Express operations in an economical and efficient manner, as did Carrier Express itself. Hence, Carrier Express and Oak

Management constituted one economic unit.

*Id.*[21]

■ In this case, the record is clear that Oney acted at all times with respect to Gotta Have It in his capacity as Vice President of ETW Corporation and AP Enterprises, not IMG. Further, although Norton and Johnston were tangentially involved in the enforcement action (essentially as information conduits), they acted solely in their capacities as personal agents for Woods and Palmer and not on behalf of IMG. In addition, Norwood was acting in the capacity of Woods' public relations manager in notifying *Golf Digest* of the impending criminal action in Augusta. No evidence has been presented to establish that these agents acted to further their own interests rather than the interests of their respective clients or that they acted beyond the scope of their authority. Indeed, like the parties in *Siegel Transfer,* IMG's interests are totally aligned with those of Woods, Palmer, ETW Corporation and AP Enterprises. Under such circumstances, an agent cannot, as a matter of law, conspire with its principal. *Siegel Transfer,* 54 F.3d at 1135. Further, no evidence has been presented to establish

that *IMG* conspired with Golden Bear or Nicklaus.[22] Hence, under these facts, the Court finds in favor of IMG of Gotta Have It's Sherman Act claims under Counts I and III.

2. *Attempt claim under the Sherman Act (Count II).*

■ Where conduct alleged in support of a Section 1 claim is not deemed anticompetitive, the same conduct alleged in support of a Section 2 claim must also fail. *Williams v. Nevada,* 999 F.2d 445, 448 (9th Cir.1993). In this case, Gotta Have It relies on the exact same conduct to support his claims under both Section 1 and Section 2 of the Sherman Act. Because the Court has found no Section 1 restraint of trade violation by IMG based upon that conduct, Gotta Have It's Section 2 claim fails as a matter of law. *See also United States v. Columbia Steel Co.,* 74 F.Supp. 671, 680 (D.Del.1947), *aff'd,* 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); *United States v. Whiting,* 212 F. 466, 478 (D.Mass., 1914)(noting in dicta that, while there can be an unreasonable restraint of trade which does not constitute a monopoly, there cannot be a monopoly which does not constitute an unreasonable restraint of trade).[23]

**21.** The court in *Siegel Transfer* also rejected the plaintiffs' argument on the "independent personal stake" exception to the intra-corporate conspiracy doctrine. Under that exception, a corporation can conspire with its agent when the agent was " 'at the time of the conspiracy, acting beyond the scope of their authority or for their own benefit.' " *Id.* (quoting *Morton Bldgs. of Neb., Inc. v. Morton Bldgs., Inc.,* 531 F.2d 910, 917 (8th Cir. 1976)). In other words, the agent must have " 'an *independent* personal stake in achieving the corporation's illegal objective.' " *Siegel Transfer,* 54 F.3d at 1136 (quoting *Greenville Pub. Co. v. Daily Reflector, Inc.,* 496 F.2d 391, 399 (4th Cir.1974)) (emphasis added).

**22.** In fact, as to the Augusta incident and the resulting publicity that Gotta Have It has dubbed a "smear campaign," Nicklaus clearly declined to be involved. In addition, none of the press releases on the incident contain comments by Nicklaus or Golden Bear Golf or anyone purportedly speaking on their behalf. Further, no evidence has been presented to show any agreement between Nicklaus

and his business entities and IMG. Although Nicklaus testified that he was told by Robert Shell, Golden Bear Golf's Vice President of Marketing, that IMG had contacted them to get involved in the enforcement actions, Shell actually testified that he just "assumed" that IMG was involved because Laytin was representing Palmer and Woods in addition to Golden Bear Golf. Summary judgment, however, cannot be defeated with mere speculation and conjecture. *See Blackston v. Shook & Fletcher Insulation Co.,* 764 F.2d 1480, 1482 (11th Cir.1985); *Avril v. The Village South, Inc.,* 934 F.Supp. 412, 417 (S.D.Fla. 1996).

**23.** In any event, no evidence has been presented that *IMG* took any unilateral action against Gotta Have It. Although IMG was responsible for a *Golf Digest* reporter being present during the arrest of Gotta Have It employees in Augusta, the Court finds that such conduct does not arise to the level of attempted monopolization. Further, although Gotta Have It has produced a single, cease-and-desist letter, served on an unrelated enti-

## B. Defamation Claims (Counts IV and V).

To prevail on its claim for defamation, Gotta Have It must prove the following:

(1) that IMG made a false statement;

(2) that the statement was communicated to a third party; and

(3) that Gotta Have It suffered damages as a result of the publication.

Shaw v. R.J. Reynolds Tobacco Co., 818 F.Supp. 1539, 1541 (M.D.Fla.1993), aff'd, 15 F.3d 1097 (11th Cir.1994). Under Florida law, truth is an affirmative defense to a defamation claim. Glickman v. Potamkin, 454 So.2d 612, 612 (Fla. 3d DCA 1984). In addition, truth combined with good motive is a complete defense. Fla. Const. art. 1. § 4; Lipsig v. Ramlawi, 2000 WL 313534, at *10 (Fla. 3d DCA Mar. 29, 2000). In this regard, the Court finds genuine issues of material fact as to whether Oney's assertions of fake signatures are true, whether Oney was speaking in his capacity as an agent of IMG, and, if such statements were made on behalf of IMG, then whether IMG acted with good motive. The Court also finds the existence of a jury issue as to Gotta Have It's damages. The Court shall therefore deny IMG's motion as to Counts IV and V.[24]

## C. Tortious Interference Claims (Counts VI and VII).

To prevail on its claim for tortious interference, Gotta Have It must prove the following:

(1) the existence of a business relationship;

(2) an intentional and unjustified interference with that relationship by IMG; and

(3) damage to Gotta Have It as a result of the tortious interference with that relationship.

Ad–Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp., 849 F.2d 1336, 1348–49 (11th Cir.1987); Tamiami Trail Tours, Inc. v. Cotton, 463 So.2d 1126, 1127 (Fla.1985). As to the first element, the existence of an enforceable contract is not necessary; rather, "the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights." Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So.2d 812, 814 (Fla.1994)(emphasis added).

> As a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered.

Id. at 815.

Here, the Court finds that Gotta Have It has failed to raise a genuine issue of material fact as to the first two elements of its tortious interference claim with respect to IMG. Specifically, no evidence has been presented to establish that Gotta Have It enjoyed "existing or prospective legal or contractual rights" as to any of its business relationships addressed herein, or that IMG intentionally interfered with those relationships. Accordingly, IMG's motion as to Count VI shall be granted.

Similarly, IMG's motion as to Count VII (conspiracy to tortiously interfere) shall also be granted. Florida law is well established that an actionable conspiracy requires an underlying actionable tort

ty and signed by Oney on IMG stationery, to show attempted monopolization of the relevant market, such a scintilla of evidence is insufficient to defeat summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

24. As to the conspiracy claim, Gotta Have It must show: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to [Gotta Have It] as a result of the acts done under the conspiracy." Raimi v. Furlong, 702 So.2d 1273, 1284 (Fla. 3d DCA 1997). Here, the Court finds genuine issues of material not as to these elements.

or wrong. *Ovadia v. Bloom,* 756 So.2d 137, 2000 WL 227961, at \*3 (Fla. 3d DCA Mar. 1, 2000); *Buckner v. Lower Fla. Keys Hosp. Dist.,* 403 So.2d 1025, 1027 (Fla. 3d DCA 1981)(citing *Liappas v. Augoustis,* 47 So.2d 582 (Fla.1950)), *rev. denied,* 412 So.2d 463 (Fla.1982). Hence, "[a]n act which does not constitute a basis for an action against one person cannot be made the basis of a civil action for conspiracy." *Buckner,* 403 So.2d at 1027. Because Gotta Have It has failed on its tortious interference claim, its conspiracy claims fails as well.

### D. *Civil Theft (Count XII).*

 Under Florida law, a cause of action for civil theft "derives from two statutory sources: the criminal section setting forth the elements of theft, and the civil section granting private parties a cause of action for a violation of the criminal section." *Ames v. Provident Life and Accident Ins. Co.,* 942 F.Supp. 551, 560 (S.D.Fla.1994), *aff'd,* 86 F.3d 1168 (11th Cir.1996). To establish a claim for civil theft, Gotta Have It must show that IMG knowingly obtained or used, or endeavored to obtain or to use, Gotta Have It's property with the intent to, either temporarily or permanently, deprive Gotta Have It of a right to the property or a benefit from the property, or appropriate the property to IMG's own use or to the use of any person not entitled to the use of the property. Fla. Stat. § 812.014(1). Further, "it is necessary to show not only that defendant obtained or endeavored to obtain the plaintiff's property, but that he did so with felonious intent to commit theft." *Ames,* 942 F.Supp. at 560. The burden of proof imposed on Gotta Have It in this regard is a clear and convincing evidence standard. *Small Business Admin. v. Echevarria,* 864 F.Supp. 1254, 1264 (S.D.Fla.1994). Based upon the undisputed material facts set out above, the Court finds insufficient clear and convincing evidence to prove the necessary felonious intent on the part of IMG. Hence, the Court shall grant summary judgment in IMG's favor as to Count XII.

### E. *Negligence Claim (Count XIII).*

 In its negligence claim, Gotta Have It asserts that IMG negligently destroyed Gotta Have It's property that was confiscated by the authorities in Augusta, Georgia, on April 9, 1997. IMG argues that it is entitled to summary judgment on that claim because of a complete lack of record evidence that any of Gotta Have It's property was destroyed. In response, Gotta Have It filed the declaration of Bruce Matthews, which is the *only* evidence in the record as regards this issue. In that declaration, Matthews states:

> During the course of this litigation, I accompanied my attorney to the law offices of Wilson, Elser for the purpose of inspecting all of the exhibits being used by the Plaintiffs in this case. These exhibits included numerous memorabilia items that were seized on April 9, 1997, by Augusta law enforcement authorities. I noted that all of the photographs of Palmer, Nicklaus and Woods that were part of the exhibits had been removed from their framing and were bent and/or torn and, thus, no longer in a condition to be sold. In addition, to the extent that these exhibits contained separate autographs of Palmer, Nicklaus or Woods on 3×5 cards, score cards or other such items, the autographs similarly were bent, marked, initialed and were no longer in a condition susceptible to resale.

Matthews' Dec. at ¶ 8. Nothing in this statement, however, implicates Third-party Defendant *IMG* in any wrongdoing. IMG is represented by different counsel than the Plaintiffs, and Matthews states he was reviewing *Plaintiffs'* exhibits, *not* Third-party Defendant IMG's exhibits. The law is clear that, in order to survive summary judgment, the non-moving party must go beyond its pleadings. Because there is nothing in the record—other than sheer speculation—to show that IMG was in any way involved with the alleged destruction of Gotta Have It's property, the Court

finds that summary judgment in IMG's favor is warranted on Gotta Have It's negligence claim.

## CONCLUSION

Based on the foregoing analysis, it is hereby

ORDERED that Third–Party Defendant International Management, Inc.'s Motion for Summary Judgment [D.E. No. 405] is GRANTED IN PART AND DENIED IN PART. IMG's motion is DENIED as to Counts IV and V, and GRANTED as to all other Counts.