**Bernard J. CARL, Plaintiff,**

**v.**

**REPUBLIC SECURITY BANK, n/k/a Wachovia Bank, N.A., Defendant.**

**No. 01–8981–CIV.**

United States District Court,
S.D. Florida.

March 27, 2003.

Todd Alan Levine, Jason Ross Marks, Kluger, Peretz, Kaplan & Berlin, Miami, FL, for Bernard Carl.

Jeremy James Hart, Aaron Rene Resnick, Gunster, Yoakley & Stewart, Miami, FL, for Republic Security Bank, a national banking institution aka Wachovia Bank.

### *ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

HURLEY, District Judge.

This case involves a dispute between a bank and a person who had a contractual relationship with a customer of the bank. The dispositive legal issue on cross-motions for summary judgment is whether certain funds, that were wire transferred and deposited into one of the bank customer's accounts, constituted a general or special deposit. For the reasons set forth below, the court concludes that the deposit was "general," and therefore the bank was entitled to take the deposited funds by setoff. Accordingly, summary judgment will be entered in favor of the bank.

#### BACKGROUND

Plaintiff Bernard Carl is a resident of Washington, D.C. Defendant Wachovia Bank is a banking and lending institution based in North Carolina, which operates branch banks in several states in the Mid–Atlantic region and southeastern United States, including Florida. Plaintiff's cause of action arises from transactions that involved Republic Security Bank. On September 14, 2001, Republic merged with Wachovia Bank, which now properly stands as the defendant in this matter.

To understand the plaintiff's dispute with the bank, it is necessary to review the bank's problems with its customer, Angelo Giordano, Mr. Giordano, a non-party to this action, was engaged in the business of arranging for entertainers to perform at various venues. He conducted business under the name of two companies he owned, Giordano World Entertainment Corporation (GWE), and World Gaming & Entertainment Corporation (WGE), both of which were based in Lee County, Fla. Each company maintained a checking account under its name and the name of Angelo Giordano at a Republic branch in Fort Myers, Fla.

On April 3, 2000, Mr. Giordano deposited a check for $150,000.00 from U.S. Knitwear in the WGE account. He received approval for a same-day cash withdrawal of $144,600.00, leaving a balance of $5,578.00. However, on April 6th, the check was returned because of an improper endorsement. This caused the account to have a negative balance of $144,422.00.

Four days later, Mr. Giordano redeposited the same check, and again was given permission to withdraw the funds immediately. The check, however, was returned for a second time for insufficient funds, leaving a negative balance of $146,463.00. To cure the problem, U.S. Knitwear, on April 17th, wire transferred $150,000.00 into the WGE account. This resulted in a $3,537.00 positive balance.

On May 1st, Mr. Giordano redeposited the U.S. Knitwear check for a third time. Again, he was given same-day availability of funds, and over the next several days, Mr. Giordano withdrew a total $95,150.00. On May 4th, the check was returned for a

third time due to insufficient funds, causing a negative balance of $95,142.00 in the WGE account. Republic thereafter sent a letter to WGE demanding repayment of $95,142.00.

Republic also terminated the employment of Dennis Cokenour, a bank manager at Republic, for failing to place a hold on the check, in violation of the bank's internal security procedures. When Mr. Giordano failed to repay the $95,142.00, Republic filed a civil complaint against WGE in the circuit court for the twentieth Judicial Circuit of Florida, in Lee County.

With this as background, we turn to the plaintiff Bernard Carl and his dealings with Angelo Giordano. In late May or June 2000, Mr. Carl entered into an oral agreement with Mr. Giordano to arrange for the R & B music group "TLC" to appear and perform at an event at Mr. Carl's summer residence in Southampton, N.Y. on June 5, 2000. The contract called for Mr. Carl to pay *GWE* $110,000.00. Mr. Carl contends—and this is not disputed—that at the time he contracted with GWE, he did not know of Mr. Giordano's or WGE's problems with Republic.

On June 1st, Mr. Carl wired an initial installment of $40,000.00 to the corporate checking account at Republic titled to GWE and Mr. Giordano. On June 2nd, Mr. Carl sent the remaining $70,000.00 installment to the same account. As soon as Republic became aware of the receipt of these monies, it froze the accounts.

On June 2, 2000, Mr. Giordano's attorney, Todd Foster, Esq., called Michael Coleman, Esq., Republic's outside counsel, and stated that Republic's freeze of Mr. Giordano's accounts would impair Mr. Giordano's ability to fulfill certain contractual obligations. (Coleman Depo., p. 12; Foster Depo., p. 12–14, 22, 46–49, 51–54). Mr. Coleman then sent a letter by fax to Mr. Giordano, with a copy to Mr. Foster, notifying him that the bank intended to take the newly-deposited funds to set off the debt in the WGE account. (Coleman Depo., p. 17–19).

On June 5th, Mr. Coleman received a letter from attorney Foster, dated June 2, 2000, stating: "This is to confirm our conversation this date wherein I advised you that your client, Republic Security Bank had improperly seized funds from the account of Giordano World Gaming Corporation such that this company will be unable to fulfill its immediate contractual obligations." (Coleman Depo. Ex. 6). Mr. Foster also strongly implied that GWE would take legal action.

Mr. Coleman responded by sending a letter by facsimile, on June 5, 2000, advising Mr. Foster that Republic had transferred money from the GWE account to cover the overdraft in the WGE account. (Coleman Depo., p. 22–23). Mr. Coleman also indicated that the bank intended to terminate its banking relationship with Mr. Giordano and any companies with which he was affiliated. (Def.Ex. 7). After that date, Mr. Coleman had no further communication with Mr. Foster or Mr. Giordano. (Coleman Depo., p. 23–24). On June 15, 2000, bank officers at Republic's headquarters in West Palm Beach, Fla. transferred $95,159.00 from the GWE account (in which Mr. Carl deposited the funds) to the WGE account which had a negative balance. On August 14, 2000, Republic dismissed its lawsuit against WGE.

The band "TLC" failed to appear and perform at Mr. Carl's event. Consequently, he filed a lawsuit in the United States District Court for the Eastern District of New York against Mr. Giordano, GWE, and WGE, asserting claims for breach of contract. Mr. Carl obtained default judgments against the defendants in that action in the total sum of $285,477.00. The judgments were later recorded with the

**1364**

clerk of the Circuit Court in Lee County, Florida.

In addition, Mr. Carl registered the New York judgments against Mr. Giordano, WGE and GWE in the Middle District of Florida. *See Carl v. Giordano et al.,* Case No. 00–MC–31. Mr. Carl initiated post-judgment garnishment proceedings against Republic, including issuing subpoenas to the bank's custodian of records to obtain documents related to accounts the judgment debtors held at Republic. Republic answered the garnishment proceedings and asserted that it had no funds belonging to the defendants.

Next, Mr. Carl filed a complaint against Republic Security Bank, now known as Wachovia Bank, in the Circuit Court for the Fifteenth Judicial Circuit of Florida. The complaint set forth five claims: (1) Count I—conversion; (2) Count II—civil theft; (3) Count III—tortious interference with a contractual or a business relationship; (4) Count IV—restitution; and (5) Count V—negligence. Plaintiff alleged $95,159.00 in damages. Defendant, based on diversity of citizenship, timely removed to federal court.

Plaintiff filed a motion for summary judgment in his favor on his wrongful set-off claims. On July 26, 2002, Wachovia filed a motion for summary judgment as to all counts of the plaintiff's complaint.

## JURISDICTION AND VENUE

■ This court has diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332 because the plaintiff is a citizen of the District of Columbia, and the defendant national banking association is a citizen of North Carolina, its principal place of business and the state listed in its organization certificate.[1] The amount-in-controversy exceeds $75,000.00, the jurisdictional threshold. Defendant bank does business in Florida and is thereby subject to personal jurisdiction under Fla. Stat. § 48.193 (2000).

---

1. This court, by an order entered January 13, 2003, ordered the parties to show cause why this case should not be remanded for lack of subject matter jurisdiction. The court noted the existence of certain persuasive authority, principally *Connecticut Nat'l Bank v. Iacono,* 785 F.Supp. 30, 33 (D.R.I.1992) and subsequent district court cases, which held that, based on the language in the Supreme Court case *Citizens & Southern Nat'l Bank v. Bougas,* 434 U.S. 35, 98 S.Ct. 88, 54 L.Ed.2d 218 (1977), under 28 U.S.C. § 1348, a banking association is a citizen of every state in which it maintains branch banks. Under the *Iacono* court's reasoning, Wachovia would be considered a citizen of Florida because it operates branch banks in the state, and therefore under 28 U.S.C. § 1441(b) would not be permitted to remove this case to federal court.

The parties subsequently briefed the issue of jurisdiction and both contended that the court should follow the reasoning of the U.S. Court of Appeals for the Seventh Circuit, which held in a recent case that a national banking association is similar to a corporation for the purposes of federal jurisdiction and is a citizen of the state of its principal place of business and the state listed in its organization certificate. *See Firstar Bank, N.A. v. Faul,* 253 F.3d 982, 994 (7th Cir.2001). The Seventh Circuit is the only federal appellate court to date that has addressed this precise issue. It should be noted that following the Seventh Circuit's decision in *Firstar,* district courts around the country have adopted its reasoning and have held that a national bank, for jurisdictional purposes, is a citizen of its principal place of business and the state listed in its organization certificate, not of every state in which it has a branch office. *See, e.g., Pitts v. First Union Nat'l Bank,* 217 F.Supp.2d 629, 631 (D.Md.2002); *Bank One, N.A. v. Euro–Alamo Inv., Inc.,* 211 F.Supp.2d 808, 810 (N.D.Tex.2002); *Bank of Am., N.A. v. Johnson,* 186 F.Supp.2d 1182, 1184 (W.D.Okla. 2001).

This court has reviewed the *Firstar Bank* decision, finds it to be very well-reasoned, and accordingly adopts its interpretation of Section 1348. The court has subject-matter jurisdiction over this case. It is not necessary for the court to entertain oral argument on the jurisdictional issue.

Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the Southern District of Florida.

## DISCUSSION

### A. LEGAL STANDARD

Summary judgment is warranted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of meeting this exacting standard. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In determining whether summary judgment is appropriate, the facts and inferences from the facts are viewed in the light most favorable to the non-moving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The non-moving party, however, bears the burden of coming forward with evidence of each essential element of his claims, such that a reasonable jury could find in his favor. *See Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir. 1990). In response to a properly-supported motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

"The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. If the non-moving party fails to "make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," then the court must enter summary judgment for the moving party. *Gonzalez v. Lee County Hous. Auth.,* 161 F.3d 1290, 1294 (11th Cir.1998).

### B. MERITS OF PLAINTIFF'S CASE

Plaintiff contends that the monies he wired into the GWE account in June 2000 constituted escrow funds, a special deposit, or a deposit for a specific purpose. As such, plaintiff asserts, Republic acted improperly when it transferred funds from the GWE account to cover the overdraft in the WGE account, another corporate account held in the names of GWE and Mr. Giordano. Plaintiff argues that he is entitled to repayment from Wachovia of the amount the bank used to offset the negative balance in the WGE account.

This case turns on an interpretation of Florida banking law. Florida's statutory version of the Uniform Commercial Code, Article 4, defines an "account" as "any deposit or credit account with a bank, including a demand, time, savings, passbook, share draft, or like account." Fla. Stat. § 674.104(1)(a). The relationship between a bank and the holder of a deposit account is contractual. *See MJZ Corp. v. Gulfstream First Bank & Trust, N.A.,* 420 So.2d 396, 397 (Fla. 4th Dist.Ct. App.1981). When a customer deposits

funds into his account, the relationship is that of the bank as a debtor and the customer as its creditor. *See Vassar v. Smith,* 134 Fla. 346, 183 So. 705, 706 (1938). Generally, when funds are deposited with a bank, the bank takes title to the money and owes a debt to its customer, which corresponds to the amount of the deposit. *Tracy v. Lucik,* 138 Fla. 188, 189 So. 430, 435 (1939).

A deposit in a savings account is classified as either a general or special deposit, depending upon the contract which results from the mutual understanding and intention of the parties. *See Bank of West Orange v. Associates Discount Corp.,* 197 So.2d 858, 861–62 (Fla. 4th Dist. Ct.App.1967). "The simple deposit of money, check or draft in a commercial bank on account of the depositor, without being complicated by any other transaction than that of depositing and withdrawing money, is a general deposit." *Id.* at 861. A general deposit is a deposit to depositor's credit, drawn on by the depositor in the usual course of banking business, and "constitutes a chose in action or right to the money deposited, creating the relationship of debtor-creditor between the bank and depositor." *See Grillo v. City Nat'l Bank of Miami,* 354 So.2d 959, 960 (Fla.3d Dist.Ct.App.1978) (citing *McCrory Stores Corp. v. Tunnicliffe,* 104 Fla. 683, 140 So. 806 (1932); *In re Estate of Thourez,* 166 So.2d 476 (Fla.2d Dist.Ct.App.1964)).

Deposits are presumed to be "general" unless they are proven to be "special." *See Bryan v. Coconut Grove Bank & Trust Co.,* 101 Fla. 947, 132 So. 481, 484 (1931). A special deposit may be created by a contractual agreement between a bank and its depositor, based on the mutual intention and understanding of the parties. *Id.,* 132 So. at 485. "A special deposit ... is a deposit for safekeeping to be returned intact upon demand, or for some specific purpose not contemplat-

ing a credit on general account." *Grillo,* 354 So.2d at 960 (citing *McCrory Stores,* 140 So. at 807). "The relationship created by a special deposit between a depositor and his or her bank is that of principal and agent, with title to the deposit remaining in the depositor." *Id.* (citing *Tunnicliffe v. Sears,* 107 Fla. 669, 148 So. 197 (1932)).

Moreover, while a depositor and a third party may agree, between themselves, upon the disposition of certain funds on deposit, a bank is not bound by the terms of any such agreement where communications delivered to the bank do not give sufficient information to require the bank to inquire as to the disposition of funds in the account. *See First Nat'l Bank of Dunedin v. Fidelity Am. Fin. Corp.,* 305 So.2d 265, 267 (Fla.2d Dist.Ct. App.1974). The purpose and terms of the deposit may be fixed by express agreement, or the intention of the parties may be inferred from their declarations at the time the deposit is made, considered in connection with their conduct and all the other circumstances. *See Bryan,* 132 So. at 485; *Bank of West Orange,* 197 So.2d at 862.

For example, types of special deposits include the deposit of certain funds or objects with a bank with the intent that the identical funds or objects be returned to the depositor. A special deposit may also include (1) money deposited with the bank for a specific and particular purpose, such as the payment of a particular note or debt, (2) money that is received by a bank as a collecting agent, or (3) money deposited with the bank for the sole and specific purpose of being transmitted by the bank to another bank to pay a definite obligation. *See Tinsley v. Amos,* 102 Fla. 1, 135 So. 397, 399 (1931). In other words, funds deposited with the bank are deemed "special deposits" when a bank and its customer have contractually agreed, ex-

plicitly or implicitly, to alter the ordinary debtor-creditor relationship and have the bank act as a bailee, trustee, or agent of the depositor, with title to the funds remaining in the depositor. *See Bryan,* 132 So. at 485.

 Under Florida law, when an individual owes a debt to a bank in the form of an outstanding loan or a negative balance, or overdraft, in a bank account, the bank has a common-law right to transfer funds from another account owned by the same bank customer to satisfy the outstanding debt. *See In re Andrews,* 33 B.R. 197, 199 (Bankr.S.D.Fla.1983). *See also* Fla. Stat. § 670.502 (under state's version of Article 4A–502 of the Uniform Commercial Code, funds wired into a depositor's account may be used to set off a debt owed by the depositor to the bank). The bank may also set forth its right to offset funds in the account agreement, which is a contract signed by the bank customer.

 The exception is in the case where the bank customer deposits the funds into a special account, or the bank has notice that the funds equitably belong to third parties or are being held in trust for another party. *See Coyle v. Pan Am. Bank of Miami,* 377 So.2d 213, 216 (Fla.3d Dist.Ct.App.1979). If the bank and the customer have contractually agreed to create a special deposit, then the bank may not use those funds to set off a debt in another account, but rather it must follow the customer's instructions as to the disposition of those funds. *See id.* If a bank has improperly used funds from a special deposit to offset a separate debt of the account holder, the legal or equitable owner of the funds may bring an action for wrongful setoff against the bank.

 Plaintiff in the present litigation, attempts to characterize the funds he transferred to the GWE account as escrow funds, a special deposit, or a deposit for a specific purpose. Plaintiff's complaint alleges that on June 2, 2000, Mr. Giordano's counsel, Todd Foster, Esq., faxed a letter to Republic notifying the bank that the amounts Mr. Carl wired into the account were being held by GWE "in escrow for the benefit of a third party," and that any conversion of the funds deposited into the GWE account to offset the debt owed to the bank in the WGE account would place GWE in breach of certain "immediate" contractual commitments GWE had with the third party—namely, GWE's agreement to provide musical talent at the event. (Complaint ¶ 19). Plaintiff further alleges that Mr. Foster and Mr. Coleman had a telephone conversation wherein Mr. Foster supposedly told Mr. Coleman that GWE "was holding the funds in escrow and that said funds had been wired into the GWE Account for the specific purpose of paying for the musical talent's appearance and performance at the Event." (Complaint ¶ 20).

 An escrow account is defined as "[a] bank account, generally held in the name of the depositor and an escrow agent, that is returnable to the depositor or paid to a third person on the fulfillment of specified conditions." BLACK'S LAW DICTIONARY 18 (7th ed.1999). "Escrow" means "[a] legal document or property delivered by a promisor to a third party to be held by the third party for a given amount of time or until the occurrence of a condition, at which time the third party is to hand over the document or property to the promisee" and "[a]n account held in trust or as security." *Id.* at 565.

Plaintiff's case fails principally for two reasons. First, an examination of the underlying oral contract between Mr. Carl and Mr. Giordano does not reveal that they ever intended that Mr. Giordano was to hold the money as security or that Mr. Giordano was to act as an escrow agent. In his complaint, plaintiff alleged that he

"entered into a contract with Giordano World Entertainment Corporation ('GWE') pursuant to which GWE agreed to arrange for certain musical talent to appear and perform at an event hosted by Carl at his home." (Complaint ¶ 5). Plaintiff, in his complaint filed in the Eastern District of New York, also alleged that he "entered into a contract with Giordano." (*Carl v. Giordano et al.*, Case No. 00–Civ.–4585(SJ), Complaint ¶ 12).

Moreover, in a memorandum faxed to GWE, Mr. Carl wrote, "I have wired the additional sum of $70,000 for a total of $110,000 to the account of Giordano World Entertainment at Republic Security Bank of Ft. Myers. This should be full payment for the booking of TLC to perform for 2–1/2 to 3 hours at a party in Southampton, New York on the evening of June 5, 2000." Mr. Foster, Mr. Giordano's attorney at the time, described the agreement between Mr. Carl and Mr. Giordano, as a "contractual obligation." (Foster Depo., p. 12).

By plaintiff's own admission, he and Mr. Giordano entered into an ordinary contract for performance of services—namely, Mr. Giordano would secure the performance of a musical group for a certain venue, date, and time, in exchange for payment from Mr. Carl. Mr. Giordano would then presumably have forwarded some of the proceeds to the group, while keeping a portion for himself as a profit. Mr. Carl did not contract directly with TLC, and there is no evidence in the record that Mr. Giordano was merely acting as an intermediary in such a contract necessitating the establishment of an escrow account. Mr. Carl and GWE were two parties to an oral contract, not a bare principal-agent relationship. Plaintiff's allegation of the creation of an escrow account is a *post-hoc* attempt to impress a favorable legal theory onto inconvenient facts.

■ Second, there is no evidence that Mr. Carl, prior to or simultaneously with wiring the money into the GWE account, ever informed Republic that those funds were to be considered a "special deposit" that should be segregated from the general funds in the account. A special deposit is created "where a depositor, *at the time the deposit is made,* enters into an agreement with the bank, or the bank receives and accepts the deposit with instructions from the depositor that the money so deposited is for a specific purpose." *Bryan,* 132 So. at 484 (emphasis added). "The character of the deposit as a general or special account is determined by the express or implied contract between the bank and the depositor *at the time that the deposit is made* when considered in connection with the conduct of the parties and all the other attendant circumstances." *Coyle,* 377 So.2d at 215 (emphasis added). *See also Southeast First Nat'l Bank of Miami v. Scutieri,* 396 So.2d 859, 861 (Fla.3d Dist.Ct.App.1981) (stating that "[t]here is no evidence that the bank agreed or was committed to accept the deposit" of money to corporation's account for the specific purpose of paying off a personal debt of the corporation's president).

Mr. Carl has not alleged that he included any special instructions limiting the use of the funds he wired, nor has he produced any documentation of having done so in early June 2000. (Carl Depo., p. 14, 21–22). No one at Wachovia was informed, prior to the wire transfer, that the funds were to be considered escrow funds, a special deposit, or a deposit for a special purpose. (Coleman Depo., p. 31). The GWE account was not set up as an escrow account. (Perkins Depo., p. 71). As such, even if Mr. Carl and Mr. Giordano had, between themselves, agreed that Mr. Carl would transfer possession of funds to Mr. Giordano for safe-keeping in an escrow account, the bank was not given any notice of such an agreement, nor did it have the

opportunity to consent to such an arrangement, prior to the time the funds were wired.

■■■ The case law indicates, however, that in the absence of an explicit contractual agreement between the bank and its customer that certain funds are to be considered a special deposit, funds transferred to a depositor's account may nevertheless be deemed a special deposit if communications given to the bank or other circumstances put the bank on notice that those funds are "special." For example, certain funds deposited into a customer's account may constitute a special deposit even in the absence of an explicit agreement where (1) the bank had actual knowledge that the funds belonged to a third party, *see Aetna Cas. & Sur. Co. v. Atlantic Nat'l Bank of West Palm Beach,* 430 F.2d 574, 577 (5th Cir.1970), (2) based on an agreement between the bank customer and a third party when the bank is informed prior to the depositing of funds that the funds are to be used to pay specific creditors, *see Bank of West Orange,* 197 So.2d at 862, or (3) when the name of the account clearly indicates the special nature of the funds, *see Nardi v. Continental Nat'l Bank,* 559 So.2d 307, 309 (Fla.3d Dist.Ct. App.1990) (holding that the name on the account put the bank on notice that it must inquire to determine whether funds in the account were held for the benefit of third persons).

Plaintiff has argued in this case that once Mr. Foster called and wrote to Mr. Coleman to inform him that the freeze on the accounts would impair Mr. Giordano's ability to perform under a contract, that provided "notice" to Republic that the funds constituted a "special deposit," thereby prohibiting the bank from using the funds transferred into the GWE account to satisfy the overdraft in the WGE account.

But Mr. Foster does not recall making any statement to that effect. (Foster Depo., p. 27–28).

Q: In that conversation [with Mr. Coleman] was an escrow agreement ever mentioned?

A: Not by me.

Q: Was it mentioned by Mr. Coleman, to the best of your recollection?

A: No.

Q: Did you mention to Mr. Coleman that these funds were escrow monies?

A: No.

Q: Did you mention that the funds were for a party that Mr. Carl was having?

A: I don't think so.

Q: . . . Did you mention that the funds were for the specific purpose of paying for an entertainer to perform at an event at Mr. Carl's house?

A: No.

Q: . . . Did you advise Mr. Coleman of the specific purpose, other than the contractual obligations, that the monies were for in the account?

A: No. I just said he had a contract to meet.

(Foster Depo., p. 27–28).

Mr. Foster further testified that he did not tell Mr. Coleman exactly what contractual obligations he believed would be impaired by freezing the account because, at the time, he himself did not know. (Foster Depo., p. 54). Mr. Coleman testified that he was not told whether GWE was holding the funds in escrow or that the deposit had been for a specific purpose. (Coleman Depo., p. 31–35, 74). Moreover, the letter sent by Mr. Foster to Mr. Coleman on June 5, 2000 did not make any reference to Bernard Carl, any escrow agreement, any

escrow monies or funds, or indicate that any funds were being held in escrow for a third party. (Coleman Depo., p. 21; Foster Depo., p. 30).

■ In any case, the court concludes that even if Mr. Foster communicated or provided notice to Republic that he deemed the transferred funds to be a special deposit, those statements were irrelevant because they occurred *after* Mr. Carl wired the funds into the GWE account. A special deposit can only be created by (1) an express contractual agreement between the account holder and the bank, or (2) created by implication when a bank is charged with knowledge at the time of the deposit, or when it permits a deposit into an account that is designated as an escrow account or a special deposit account. Here, there was no express agreement between Mr. Giordano and Republic that the GWE account was set up to collect escrow funds. Nor was there any indication given to Republic, prior to the time the funds were wired, that any funds deposited into the GWE account should be deemed "special."

It is also irrelevant that the bank could determine that Mr. Carl was the source of the wire transfers because knowledge of the source alone would not give the bank notice that the funds were a special deposit. *See Aetna Cas. & Sur. Co. v. Bank of Palm Beach & Trust Co.,* 373 So.2d 687, 688 (Fla. 4th Dist.Ct.App.1979) ("We cannot see why knowledge of the sources of the deposited checks would make any difference. These deposits were not placed in a trust account, nor is there any allegation that the deposit checks bore any legends restraining their use."). The terms of the account agreements between Mr. Giordano, his companies, and Republic provided that the bank could set off funds between accounts if necessary to satisfy an overdraft.

Plaintiff's case rests on the flawed premise that if a bank is given notice that certain funds are a special deposit at any time before those funds are used to set off another debt, then those funds must be considered a special deposit which may not be used to satisfy a negative balance in another account. Under plaintiff's reasoning, a party's use of the word "special deposit" at any time prior to the moment of set-off acts as a talisman that would bar a bank from exercising its set-off rights. Florida banking law and the case law, however, clearly undermine plaintiff's premise.

What plaintiff fails to recognize is that a "special deposit" is a creature of contract law, whereby a bank customer and the bank have entered into an express or implied agreement that the bank will hold certain funds for safe-keeping with title remaining in the customer or a third party. If, as in this case, the depositor of the funds fails to specify the conditions he is attaching to the bank's receipt of the funds, at the time the funds are deposited, and there are no circumstances tending to prove the formation of an implied-in-fact contract, then it can hardly be argued that the bank contractually agreed to accept the funds from Mr. Carl on the condition that it would act as an agent, bailee, or trustee of the funds. Had Mr. Carl set forth the terms of his deposit prior to or at the time he wired the funds, the bank would have had the opportunity to decide whether to agree to those terms, or if it was unable or unwilling to do so, remit the money directly to him.

In summary, there is no evidence that Mr. Giordano and Mr. Carl agreed that the funds Mr. Carl was to deposit would be considered a special deposit, rather than payment pursuant to a contract. Second, Mr. Foster's statements to the bank were ineffective to create a special deposit be-

cause those statements were made after the deposits were made. Third, to the extent that communications made to the bank after the funds were deposited could be deemed notice that the funds legally or equitably belonged to third parties, in this case the notice was insufficient because at no point prior to set-off did Mr. Foster ever state that the deposit equitably belonged to Mr. Carl. As such, plaintiff has failed to meet his burden to establish that the funds he deposited were a special deposit.

For the forgoing reasons, the court concludes there is no genuine issue of material fact that the funds wired into the GWE account in early June 2000 constituted a general deposit and not a special deposit, a deposit for a specific purpose, or escrow funds. Republic acted pursuant to its common-law rights and contractual rights under the account agreements when it used funds in the GWE account to offset a negative balance in the WGE account.

■ Having concluded that the bank did not engage in wrongful set-off, the court now turns to the specific claims set forth in plaintiff's complaint. First, Mr. Carl contends that Republic improperly converted his money for its own use. "The essence of the tort of conversion is the exercise of wrongful dominion or control over property to the detriment of the rights of the actual owner." *Seymour v. Adams*, 638 So.2d 1044, 1046–47 (Fla. 5th Dist.Ct.App.1994) (citing *United Am. Bank of Central Fla., Inc. v. Seligman*, 599 So.2d 1014, 1017 (Fla. 5th Dist.Ct.App. 1992)). The former Fifth Circuit, in interpreting Texas law, stated that a claim of wrongful set-off is simply a subspecies of a conversion claim. *South Cent. Livestock Dealers, Inc. v. Security State Bank of Hedley, Tex.*, 614 F.2d 1056, 1061 (5th Cir.1980).

As long as the plaintiff adequately states a claim for wrongful set-off, it is unimportant whether the plaintiff uses the phrase "wrongful set-off" or labels his claim as a conversion claim. The evidence clearly establishes that under the applicable law related to banking, Mr. Carl had no property interest in the funds after they were transferred into the GWE account. Therefore, under the facts as alleged in the complaint and based on the undisputed evidence in the record, plaintiff is unable to state a claim of conversion against Wachovia Bank.

■ Count II of the complaint sets forth a claim of civil theft. A claim of civil theft arises from two statutory sources—a criminal section which sets forth the elements of theft, and a civil section which grants private parties a right of action for a violation of the criminal section. *See Palmer v. Gotta Have It Golf Collectibles, Inc.*, 106 F.Supp.2d 1289, 1303 (S.D.Fla. 2000). To establish a claim of civil theft, a plaintiff must prove, by clear and convincing evidence, that the defendant knowingly obtained or used the property of another with the intent to temporarily or permanently deprive the other person of a right to or a benefit from the property. *Id.*

■ Once Mr. Carl gave his money to the bank, he had no remaining interest in the funds he transferred, and therefore he cannot state a claim of civil theft. Moreover, since the bank exercised its contractual right to set off a negative balance between the two accounts, it is clear that the bank and its agents lacked the requisite mental state under the statute—that is, acting with the intent to permanently deprive Mr. Carl of property that was rightfully his. *See Ames v. Provident Life & Accident Co.*, 942 F.Supp. 551, 560 (S.D.Fla.1994).

■ In his third count, plaintiff has alleged that the bank committed the tort of intentional interference with a contractual relationship. To prevail on a claim of tortious interference, a plaintiff must

prove (1) the existence of a business relationship or an enforceable contract, (2) knowledge of the relationship on the part of the defendant, (3) an intentional and unjustified interference with the relationship by the defendant, and (4) damage to the plaintiff as a result of the breach of the relationship. *See Tamiami Trail Tours, Inc. v. Cotton,* 463 So.2d 1126, 1127 (Fla. 1985) (elements of tortious interference with a business relationship); *Wackenhut Corp. v. Maimone,* 389 So.2d 656, 657 (Fla. 4th Dist.Ct.App.1980) (elements of tortious interference with a contractual relationship).

■ While Mr. Foster may have given Mr. Coleman some vague indication that the bank's freezing of the accounts would impair Mr. Giordano's ability to meet his contractual obligations, Mr. Foster did not know nor did he provide any specific information about the contract between Mr. Carl and Mr. Giordano. In any case, since Republic acted within its own contractual rights under the account agreements when it set off funds between the GWE and WGE accounts, it cannot be held liable in tort for interference with a separate contractual relationship. *See Ethyl Corp. v. Balter,* 386 So.2d 1220, 1225 (Fla.3d Dist. Ct.App.1980). Accordingly, this court will enter summary judgment in favor of Wachovia on this claim.

■ Plaintiff alleges in Count IV that he is entitled to restitution from the bank. Restitution is defined as "[r]eturn or restoration of some specific thing to its rightful owner or status;" "compensation for benefits derived from a wrong done to another;" "compensation or reparation for the loss caused to another." BLACK'S LAW DICTIONARY 1315 (7th ed.1999). Restitution is awarded under the theory that a party that has been unjustly enriched "should be required to compensate the plaintiff" whose right of recovery "rests both on money paid by mistake of fact and by mistake of law." *Sun Coast Int'l, Inc. v. Department of Bus. Regulation,* 596 So.2d 1118, 1120–21 (Fla. 1st Dist.Ct.App.1992).

■ This court has previously concluded that plaintiff relinquished all property rights in the funds once they were transferred into the GWE account. Republic's use of those funds was not wrongful, nor did it commit a legally cognizable harm to Mr. Carl. Since plaintiff cannot demonstrate that he is entitled to the equitable remedy of restitution, the court will enter summary judgment in favor of the defendant on this claim.

Finally, plaintiff has alleged in Count V a claim of negligence. In this claim, Mr. Carl is arguing that the bank's negligent violation of basic banking procedures created the risk that any funds subsequently deposited into the account would have to be seized by the bank, thereby rendering the account-holder incapable of using those funds to fulfill his contractual obligations. Certainly, it seems inequitable to permit a bank that failed to follow its own procedures, on three occasions, to cover its losses with funds traceable to an innocent non-customer.

■ The court notes that there is case law holding that a bank may be found liable when its negligence causes its customer to sustain economic losses, and the U.C.C. does not necessarily preempt a bank customer's common-law actions against a bank. *See, e.g., Federal Ins. Co. v. NCNB Nat'l Bank of N.C.,* 958 F.2d 1544, 1550 (11th Cir.1992). However, it is important to note that the duties owed by a bank are generally contractual in nature. In this case, Republic owed no duty of care to Mr. Carl, who was not a customer of the bank, or to the banking community at large. The bank's actions, however egregious, created no legally cognizable harm to him, and his only truly viable claim is one for breach of contract against Mr. Giordano and his companies.

CONCLUSION

There is a complete absence of evidence of the formation of an express or implied contract between Mr. Giordano, Mr. Carl, and the defendant bank that would allow this court to conclude that the funds he wired in June 2000 constituted a special deposit under Florida banking law. Plaintiff is not entitled to return of those funds.

For the forgoing reasons, it is hereby **ORDERED** and **ADJUDGED** that the defendant's motion for summary judgment [DE # 30] is **GRANTED.** Plaintiff's motion for summary judgment [DE # 26] is **DENIED.** A final judgment will be issued in a separate order.